1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10

11   RAY GUTIERREZ, JR.,                    No.  1:14-cv-01753-AWI-JLT (HC)

12                  Petitioner,             **FINDINGS AND RECOMMENDATION**
                                            **TO DENY PETITION FOR WRIT OF**
13         v.                               **HABEAS CORPUS**

14   R. GROVES,                             **[TWENTY-ONE DAY OBJECTION**
                                            **DEADLINE]**
15                  Respondent.

16

17         Petitioner is currently in the custody of the California Department of Corrections and

18   Rehabilitation serving a sentence of eighty years-to-life for his conviction of first degree murder

19   with enhancements for use of a firearm, for assisting a gang, and for having a prior criminal

20   conviction.  In this action, Petitioner raises numerous claims challenging his conviction.  The

21   Court finds that the state court rejections of these claims were not contrary to, or an unreasonable

22   application of, Supreme Court precedent and recommends the petition be **DENIED.**

23   **I.      PROCEDURAL HISTORY**

24         On May 31, 2011, Petitioner was convicted in the Stanislaus County Superior Court of

25   first degree murder (Cal. Penal Code § 187(a)), with the use of a firearm (Cal. Penal Code §

26   12022.53(d), (e)(1)), for the benefit of or in association with a criminal street gang (Cal. Penal

27   Code §186.22(b)(1)).  People v. Gutierrez, No. F062970, 2013 WL 4523566 (Cal. Ct. App. Aug.

28   26, 2013).  In a bifurcated court trial, Petitioner was found guilty of having suffered a prior

1    serious felony conviction which constituted a strike.  Id.  Petitioner was sentenced to 80 years-to-

2    life.  Id.

3          Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

4    DCA").  On August 26, 2013, the Fifth DCA issued its opinion affirming the judgment.  Id.

5    Petitioner filed a petition for review in the California Supreme Court.  (LD[1] 19.)  On November

6    20, 2013, the petition for review was denied.  (LD 20.)

7          Petitioner next filed a habeas petition in the Stanislaus County Superior Court.  (LD 21.)

8    On October 22, 2014, the petition was denied.  (LD 22.)  On November 14, 2014, Petitioner filed

9    a habeas petition in the Fifth DCA.  (LD 23.)  The petition was rejected on November 20, 2014.

10   (LD 24.)  He filed a second petition for writ of habeas corpus in the Fifth DCA.  (LD 25.)  The

11   Fifth DCA denied that petition on January 9, 2015.  (LD 26.)  Finally, he filed a habeas petition in

12   the California Supreme Court on November 13, 2014.  (LD 27.)  On January 21, 2015, the

13   petition was denied.  (LD 28.)

14         On November 10, 2014, Petitioner filed the instant petition for writ of habeas corpus in

15   this Court.  (Doc. No. 1.)  Petitioner moved to amend his petition on May 4, 2015, in order to add

16   additional claims.  (Doc. No. 14.)  The Court granted his motion to amend on May 20, 2015.

17   (Doc. No. 15.)  Respondent filed an answer to all claims on January 4, 2016.  (Doc. No. 29.)

18   Petitioner requested and was granted four extensions of time to file a traverse; however, Petitioner

19   did not file a traverse to Respondent's answer.

20   **II.    FACTUAL BACKGROUND**

21         The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision.[2]

22   Defendants Ray Gutierrez, Jr., and Alvaro Leal Saldana, Jr., stand convicted,
     following a jury trial, of first degree murder (Pen.Code,1 § 187, subd. (a)), during
23   the commission of which a principal personally and intentionally discharged a
     firearm and proximately caused death (§ 12022.53, subds.(d) & (e)(1)), and which
24   was committed for the benefit of or in association with a criminal street gang (§
     186.22, subd. (b)(1)). Following a bifurcated court trial, each was found to have
25   suffered a prior serious felony conviction that was also a strike. (§ 667, subds.(a)
     & (d).) Each was sentenced to a total term of five years plus 75 years to life in

26

---

27   [1] "LD" refers to the documents lodged by Respondent.
     [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).
     Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir.
28   2009).

2

prison and ordered to pay restitution and various fees, fines, and penalties. Both appeal. We affirm the judgments.

# FACTS

## I

## PROSECUTION EVIDENCE

On March 22, 2008, Tommy and Eloisa Gonzales were married in Turlock. [N.2] Roger Villanueva, whose nickname was "Smoke da Villain," was one of the groomsmen. His girlfriend, Irma Bernal, was a bridesmaid. Members of the wedding party wore red and white. The wedding reception was held at the Grange Hall in Hilmar. More than 100 people attended. In keeping with the wedding party's color scheme, the color red predominated in their clothing. Entertainment at the reception included a group of Eloisa's friends who called themselves Spit Flame and who rapped and sang. Villanueva and Rene Zarate ("Bullet G") were among the group's members. [N.3]

> [N.2] Except as otherwise specified, references to dates in the statement of facts are to the year 2008.For the sake of clarity, and because sometimes last names were not given, we refer to several persons by their first names. No disrespect is intended.

> [N.3] One of the group's founders Moses Rodriguez ("Rap Addict"), had been shot and killed in the "Woods" area of Turlock about a year earlier. Eloisa was godmother to his son.

Defendants (who are brothers) did not attend the wedding, but were present at the reception. They did not get along with Zarate or Villanueva. Miguel Perez, a good friend of Eloisa and Villanueva, also attended the reception. Perez's status with the Norteño gang was "inactive." He had "just kind of walked away from it" 10 to 15 years earlier, creating friction between him and gang members. He had had prior verbal confrontations with Gutierrez because of it. He had not had any confrontations with Saldana. Perez also had personal issues with Gutierrez that went back a number of years and were not gang related.

At some point, defendants were yelling at Chico, Perez's friend, on the front lawn of the Grange Hall. Perez went to get Chico to take him across the street to a bar. Perez also tried to put his hand out and tell them to "squash" all the problems, but Gutierrez looked at him and laughed. Perez and Gutierrez then exchanged blows. Gutierrez fell back after Perez struck him. Meanwhile, Saldana was standing behind Perez, and there were several people hitting Perez from behind. Someone— Perez thought Villanueva, although he did not see who threw the punch—knocked Saldana out. Tommy was yelling at Gutierrez and Perez, and Perez told Gutierrez they would see each other when they saw each other. [N.4]

> [N.4] Near the end of the reception, there was a fight involving Tommy, some of his groomsmen, and about 50 people in the bar's parking lot. Defendants had already left by the time this fight broke out.

About four days after the wedding, Villanueva and Bernal moved to Arizona. Sometime during that four days, they were driving near the Turlock Cemetery when they saw Saldana, who was alone, driving the opposite direction. He stopped the car, pointed at Villanueva, and made a gun gesture with his hands. Villanueva

told Bernal "they" were looking for him, although he did not say who.

Jorge Tapia was defendants' second cousin. He grew up in the Angelus Street area of Turlock and, as of May 25, resided in the area of Angelus and Ninth Street. He knew of the Norteño gang, which claimed red and whose members sometimes had tattoos such as "XIV" and "X4." Tapia sometimes socialized with persons who "claim[ed] Norteño," but he denied being a gang member himself.

About a week before May 25, Gutierrez gave Tapia an item wrapped in cloth and asked him to hold it for him. Gutierrez did not say anything about a gun or tell Tapia what the item was. Although it felt heavy and hard, Tapia did not unwrap it to see what it was, but put it in a shoebox in his room and left it there. [N.5]

> [N.5] Detective Bertram and Investigator Bunch of the district attorney's office interviewed Tapia some two to three weeks after May 25. During the interview, Tapia made it clear he knew Gutierrez had given him a gun. Tapia said it was a .40–caliber Glock with a red laser sight.

Around the same time, Villanueva and Bernal returned to Villanueva's mother's house in Keyes. They planned to return to Arizona the week following May 25.

On May 25, Gutierrez telephoned Tapia and asked him for "that thing." An hour or so later, Gutierrez came by Tapia's residence in his white Nissan Altima. Saldana was with him. Both were wearing blue pants and black shirts. Tapia met them at the car and gave Gutierrez the wrapped item, then got into the back seat. Gutierrez said they were going to go check out some shoes "from Tommy." [N.6] Villanueva's name was not brought up, and nobody said anything about what had happened at the wedding reception. Before the car pulled away, however, Saldana said maybe somebody would get in a fight.

> [N.6] Tommy sold knockoff Michael Jordan tennis shoes.

Around 6:00 p.m. on May 25, Eloisa attended a barbecue at her friend Brandy's residence, a duplex in the 200 block of Angelus Street. The barbecue was being held because it was Moses Rodriguez's birthday. About 20 people had met up at the cemetery where he was buried, then gone to the house on Angelus. Villanueva was one of those at the cemetery.

Eloisa went to the grocery store, then returned to the duplex. By the time she got back, more people—including defendants—had arrived. They and at least seven people were standing against the fence of an abandoned house next to the duplexes. Defendants both were wearing black T-shirts. Gutierrez had on a hat. A chunky, Hispanic male appeared to be in their company.

Villanueva and Darnell Lambert drove up and parked across the street, then walked up to the group of men. Villanueva told Saldana that he wanted to "squash it" (let it go) and did not want any problems with "them," but, when Villanueva extended his hand, Saldana refused to shake it. Eloisa saw the look on Saldana's face; it was angry and he was grinding his teeth. He stayed like that until he turned away. Villanueva—who was considerably larger than Saldana—followed him to the backyard of the abandoned house. None of the other men went with them. As Villanueva went toward the back, he took off his Oakland A's hat and jacket (underneath which he was wearing a white T-shirt) and hung them on the fence. He also removed a thick chain with a cross that he wore all the time. Eloisa did not see where he put it.

4

Concerned, Eloisa yelled at Lambert to do something, and not to let them go to the back. Lambert responded that it was going to be fine, as they were just going to talk out whatever it was. Eloisa then yelled for Tommy. Tommy was at his father's house, which was on the other side of the abandoned house. [N.7] He came out onto the front porch and told Lambert to go back there.

> [N.7] The abandoned house was between Brandy's duplex and Tommy's father's house.

Meanwhile, Gutierrez was pacing quickly back and forth by the fence. Saldana and Villanueva moved out of Eloisa's sight. While Lambert was responding to Tommy, Gutierrez ran to the back. Eloisa lost sight of him, then, within seconds, she heard multiple gunshots fired in rapid succession from a single gun. As soon as the shots stopped, she saw defendants run down Angelus Street. She ran toward the back and found Villanueva bleeding to death on the ground.

Eloisa did not think the shooting was gang related. She did not see anyone flash gang signs or any indication of gang activity. She was aware that the color red was associated with Norteños. She was also aware defendants were members of Varrio West Side Turlock or Turlocos, a Norteño gang that claimed the color red and number 14. Eloisa denied Tommy was a Norteño; she chose red accents for her wedding colors because Tommy's birthstone is red garnet.

At approximately 6:10 p.m. on May 25, Turlock police received a report of the shooting. Sergeant Morgan and Officer Ramon were the first to respond, arriving at the scene within a minute or two of being dispatched. At least 50 to 70 hostile people were in the street, yelling and pointing toward the back of an apartment complex. In the back were a few people and Villanueva, who appeared to be dead.

Eloisa was angry and yelling that it was not right. Morgan made contact with her, but Tommy tried to hush her and told her that she did not see anything. Morgan tried to talk to Tommy, but Tommy said he did not see anything. Tommy said he and Eloisa had been inside his father's home next door.

Morgan had had prior dealings with Tommy and considered him a gangster. From working in the area for 20 years, Morgan considered Angelus Street in this part of town to be the heart of Turlock's gang area. Morgan was also familiar with the "Woods," a part of Turlock in which many of the street names ended with "wood." He believed, but was not positive, it was Sureño territory. Morgan was familiar with the Moses Rodriguez homicide. No one was ever apprehended; it was deemed at the time possibly to be self-defense.

An autopsy revealed multiple bullet wounds, including five entrance wounds, to Villanueva's body. Some were from front to back, while others were from back to front. One bullet, which entered the right side of the head, was found inside the brain. Abrasions surrounding the bullet hole indicated it was likely a close-range shot. Another bullet entered the left side of the neck and struck the mandible. Fragments of that bullet were located in the body. Another bullet was located near the pelvic bone area. The gunshot wound to the head was fatal, while the wounds to the left side of the back and left side of the hip could also have been fatal. It was not possible to determine in which order the wounds were received, or the position Villanueva was in at the time he received them. Similarly, the gun's position when any given shot was fired could not be determined. The cause of death was multiple gunshot wounds. Toxicology reports revealed small amounts of alcohol, cocaine, MDMA (Ecstasy), and methamphetamine in Villanueva's system. Cocaine and

methamphetamine are stimulants that can cause some users to become aggressive.

Thirteen spent .40–caliber shell casings were found at the scene, as were five expended bullets. [N.8] Subsequent examination showed the shell casings were all fired from the same firearm, most likely a Glock pistol. Subsequent analysis of the fired projectiles showed they were .40 caliber, and the rifling was consistent with the standard rifling of a .40–caliber Glock pistol.

> [N.8] One of the bullets was lying on the ground, while the others were recovered from walls of buildings and other nearby objects.

On the night of May 29, the white Nissan involved in the shooting was found in San Jose, partially burned and smelling of a gasolinelike accelerant. A singed black beanie cap was found about 25 feet from the vehicle. Subsequent testing showed Gutierrez to be the major contributor to DNA found on the hat. When Gutierrez was brought to the Turlock Police Department following his arrest, he complained that his arm was hurting and said he burned it when he was barbecuing. At the hospital, however, he told the doctor the burn was from gasoline. His face also appeared to have been burned.

Tapia assisted the police in locating defendants in North Highlands. Gutierrez's identification, and the Nissan's registration and key were found at the same location.

On August 15, there was a fight between Manuel Nunez and Steven Ramirez, two inmates housed in the SHU at the Stanislaus County Public Safety Center (jail). [N.9] As a result, their cell was searched. Two large rolls of wilas were found. [N.10] The wilas were turned over to Paul Teso, a gang expert in the Classification Unit. Teso had worked as a gang officer for more than 11 years. His expertise came from interviewing hundreds of suspected and admitted gang members, as well as classes he took on gangs in general and Stanislaus County gangs in particular.

> [N.9] The SHU is the jail's maximum security housing unit. Many Norteños are housed there.

> [N.10] A wila is microwriting—a small written note—used by prisoners (usually gang members) to communicate with each other, and with those in other custodial facilities and out on the streets, without jail personnel being privy to the communication.

Teso explained that if an inmate coming into custody claims gang membership, he is housed with the gang with which he claims affiliation. For inmate protection and security, Norteño gang members are segregated from the general population and from members of other criminal street gangs.

There is a Norteño chain of command at the jail. The lowest level is yard security. This inmate is in charge of security out in the yard, and makes sure Norteño inmates "program" on the yard the same way they would in prison. Next is the teacher, who is in charge of education. Norteño gang members have mandatory training an hour a day. The training covers a variety of topics, including writing wilas. The next level is the group leader. He is in charge of a particular cell in which a group of Norteño inmates are housed. Next is tier security. He is in charge of a group of cells on a tier. Next is the channel, who usually has communication to the streets. The highest person at the county level is the overall, who is in charge

1  of all three county facilities.

2  The "14 Bonds" are rules and regulations used by the Norteños to keep everyone in line. Norteños take the 14 Bonds and household policies (which vary, depending upon the facility) "very seriously, serious [enough] to kill for." A Norteño who does not follow the rules is "subject to discipline up to death." Fear and intimidation are how Norteños keep each other in check; someone not following the rules is subject to discipline at the discretion of the person in charge. A removal occurs when an inmate is no longer welcome in the gang due to his rule violation(s), and so his face will be sliced to leave a scar. No matter where he goes within any custodial facility, a background check will be done to determine why he was removed.

7  Once an active Norteño gang member is booked into the jail, he will be placed "on freeze." This means he cannot hold any position, no information is supposed to be filtered through him, he is not supposed to have access to wilas, and he cannot participate in education or exercises or program with the active Norteños. The rules of the gang require that the new arrival report his incarceration to the gang higher-ups by filling out a new arrival questionnaire, which is given to the group leader and from there moves up the chain of command. This allows the gang to do a security check by channeling the information from the questionnaire to the streets and prisons, to find out if there is any negative information about the new arrival. If the information shows anything for which the new arrival could be removed and he was not cleared, then the new arrival will be assaulted or even killed. The new arrival will be on freeze until the security check is run and he is cleared and in good standing.

15  A Norteño dropout is supposed to be assaulted (with weapons, if available) and even killed on sight. A dropout is considered a degenerate who is worse than a child molester. If an active member knows someone to be a dropout and has access to that person, the active member is to assault the dropout. If an inmate is labeled a degenerate, this shows he was once a Norteño gang member and has stepped away from the organization. To a Norteño, a Norteño dropout is probably the worst thing someone can be. If an active gang member associates with a dropout (something that does not happen in custody, but does occur out on the streets) and is identified by another active member as doing so, the person who was associating with the dropout will have to explain why he did so and will usually have to "put in work" to clear himself and get back in the organization's good graces. Coming to the aid of a dropout who was fighting with an active Norteño would be a very severe rule violation, because it would be considered aiding the enemy "against your homeboys."

22  "Red-on-red violence" refers to when a Norteño assaults another active Norteño. It is not activity that is sanctioned by the gang, as Norteños are supposed to stick together. Red-on-red crime is seen as weakening the organization. Accordingly, in order for a Norteño to remove another active Norteño, he has to have clearance from higher up the chain of command. If he removes or assaults another active Norteño without clearance, he himself will be subject to removal. In Teso's experience, if there is red-on-red violence that is not cleared beforehand or sanctioned from above, the people responsible will have to write a report and explain their actions. That information will get channeled to the prisons, and the prison shotcallers will determine if the perpetrators will remain in good standing in the gang. If it is determined the removal was a bad one, the perpetrators will be disciplined for their actions and possibly removed themselves.

Insofar as the wilas seized following the fight were concerned, Teso knew Steven Ramirez to be tier security of the east quarters of the county jail. The east quarters housed Norteños. Manuel Nunez was the overall, meaning the person in charge, or shot caller, of all three county facilities.

Two new arrival questionnaires were among the 60–plus wilas related to this case. One was written from "Tito" to "La Casa," which refers to the stronghold or household of the Norteños. It was dated June 14; defendants were both booked into the jail on June 12, and it generally takes a day for a new arrival to complete and submit a new arrival questionnaire. The wila gave information such as full name, booking number, date of birth, physical description, and tattoos, all of which corresponded to the information Teso had about Saldana. As of June 14, Saldana was an active Norteño; however, as with all new arrivals, he was placed on freeze. Teso surmised he was cleared not long after his arrival, because Teso found his name on an active tier roster, which is a list of all active Norteño gang members in custody and where they are housed. As of March 2011, when Teso testified, Saldana was still housed with the active Norteños, which would not have been the case if officers had received information he was in bad standing and subject to removal.

The other wila, which was dated June 15, was also addressed to La Casa. It gave a name, nickname ("Ramo"), date of birth, booking number, physical description, and tattoos, all of which corresponded to the information Teso had about Gutierrez.

In the wilas, defendants both gave their town as Turlock, and their "hood" as VWST, meaning Varrio West Side Turlock. Neither wila stated what happened in the backyard with respect to Villanueva. During his career, however, Teso had reviewed thousands of wilas written by Norteños, and he had never read one in which the gang member confessed to the crime that put him in custody.

According to Teso, fear and intimidation are "hallmarks" of the Norteño criminal street gang. They keep their members in line through fear and intimidation on the streets and in the neighborhoods, plus citizens are reluctant to cooperate with law enforcement because of fear of retaliation from the gang. Fear and intimidation create a reputation for the gang, and the gang benefits because the fear and intimidation allow gang members to carry on with their criminal activity. Reputation is important for a gang, as it intimidates other gangs and allows the gang to establish control over a specific area, for example, for drug sales, while making it less likely a rival gang will attempt to infringe on that area. Fear and intimidation among the ranks of Norteños benefits the gang as a whole, because all members benefit from the gang's reputation, even in prison. If a gang is known in the prison system as being weak, it will be victimized by other gangs. If a gang has a strong reputation, it will be easier for that gang to recruit new gang members and build the gang stronger in numbers.

Investigator Froilan Mariscal of the district attorney's office also testified as a gang expert. He had been raised in Modesto and exposed to the Norteño criminal street gang from childhood. He had training and experience with respect to Hispanic gangs, primarily Norteños and Sureños.

Mariscal explained that the Norteño criminal street gang is a large organization with approximately 3,000 to 4,000 documented members in Stanislaus County as of May 2008. Depending on the neighborhood, it may break up into little subgroups or subsets of more tightly knit gang members who claim a particular

neighborhood as their own and use a certain name for that neighborhood. For example, Deep South Side Modesto and OGL, South Side Modesto are both groups of Norteño gang members, and they unify under the Norteño organization, the color red, and the number 14. Because they are from different neighborhoods, however, they use different names. "Turloco"—a combination of "Turlock" and "loco," Spanish for "crazy"—is a word Norteño gang members in Turlock adopted for themselves. Varrio West Side Turlock, which goes by the acronym VWST, is the primary Norteño gang in Turlock. Angelus Street is a very active location for Norteño gang activity in Turlock.

Based on his personal involvement with hundreds of investigations of gang crimes, Mariscal opined that as of May 2008, the primary activities of the Norteño criminal street gang were murders, attempted murders, assaults, drug dealing, robberies, car thefts, burglaries, various crimes associated with weapons violations, and various crimes associated with narcotic violations. The Norteño gang had a reputation for being violent within its own gang, and also in the eyes of rival gangs and communities as a whole.

According to Mariscal, gangs thrive through fear and intimidation. Those are hallmarks of the Norteño criminal street gang. Respect is a big issue for gang members. They want to be respected, and to them, the more someone fears them, the more they are respected. Instilling fear and intimidation in others equals respect to them.

For a known dropout physically to assault an active gang member in the presence of other gang members is "an ultimate sign of disrespect." A dropout is considered "lower than scum" and the enemy of the gang. In Mariscal's experience, the only way an active gang member can rebound from that is to respond "with ultimate violence" against the dropout. If he does not, he will be viewed as weak. He has to prove he is still worthy of being in the gang and can respond with violence when confronted with violence. Because the Norteño gang thrives off of the fear and intimidation coming from violent acts within the gang, if there are members who are not willing to participate in violent acts or to prove their violent tendencies, especially after being disrespected, the gang and its reputation fall apart. The gang will not be able to function and commit the crimes that allow a gang to thrive.

Villanueva had gang tattoos, but also had a tattoo reading "Bidnezz First." This was consistent with the contents of the Saldana wila, which stated that the author did not know if the person he was accused of murdering was active or nonactive, but that on several occasions he promoted himself as a degenerate: He was known for hanging around with inactive individuals and, when confronted about the people with whom he associated, made comments about how he was all about his money and the homies did not put money in his pocket. Nothing in his investigation led Mariscal to believe Villanueva was a Norteño dropout. Rather, investigation showed he was an active gang member at the time of the wedding and the date he was shot.

Mariscal had information Villanueva was in trouble with the gang at the time he was killed. Although he was still an active gang member at that point, the fact he came to the aid of a dropout (Perez) against active gang members two months earlier at the wedding is something that would get a person in trouble with the gang. [N.11] If Villanueva was not considered to be in good standing with the gang, it would have been very unwise for him to go to the area that has the most Norteño gang activity in Turlock. In Mariscal's opinion, Villanueva may have thought he was in good standing when he went to Angelus Street.

9

[N.11] There is a difference between not being an active gang member and being a dropout. Being inactive does not necessarily mean the person is not in the gang anymore, but simply that the person stepped away or is not currently associating or conducting criminal activity with the gang. Being a dropout means the person is no longer part of the gang and has decided to disassociate completely from the gang. Although Perez testified he was not active, he previously told Mariscal he was a dropout.

In giving an opinion as to whether someone is a gang member, Mariscal considers the totality of the circumstances based on the result of an investigation he conducts of the person. He uses 12 criteria, which include whether the person has been arrested with other gang members in the past; whether the person associates with gang members; whether the person has been identified as a gang member by a reliable source; whether the person has admitted being a gang member in the past; whether the person has been contacted wearing gang colors; whether the person has possessed gang paraphernalia; whether the person has admitted gang membership during a classification interview; whether the person has used gang symbols; whether the person frequents gang areas; whether the person has gang tattoos; and whether the person's name has been found on a gang roster. A person must meet at least two of the criteria before Mariscal will call that person a gang member.

In Mariscal's opinion, Gutierrez was a Norteño gang member on May 25. Mariscal based this opinion on everything he reviewed involving Gutierrez: Gutierrez was contacted, on four occasions, while associating with other Norteño gang members; on nine occasions, he was arrested alone or with other gang members; he had gang tattoos, including "Varrio West Side Turlock"; he admitted being a Northerner on three occasions; he used gang hand signs and symbols; on one occasion, he was identified as a gang member by a reliable source; and he admitted being a gang member during a classification interview at the jail. [N.12]

[N.12] With respect to both defendants, Mariscal described in detail for the jury the reports and other information upon which he based his opinions. We discuss this testimony in more detail in conjunction with defendants' claim it was improperly admitted, post.

In Mariscal's opinion, Saldana also was a Norteño gang member on May 25. Mariscal based this opinion on everything he reviewed concerning Saldana: Saldana associated with Norteño gang members on nine occasions; he was arrested alone or with gang members on 12 occasions; he had gang tattoos, including "VWST"; he was identified as a Norteño gang member by a reliable source; he used or possessed gang symbols on three occasions; his name appeared on an active gang member roster; and he admitted being a Northerner on four occasions.

In Mariscal's experience, red-on-red violence is disfavored by Norteños. A Norteño wanting to assault a fellow gang member must first get approval from the gang. If there is red-on-red violence, the parties involved submit reports to the gang leaders. The gang leaders actually conduct an investigation into the incident to determine whether the person who committed the assault was in the right. Often, the gang members who commit these assaults are cleared, because the investigation reveals the victim of the assault violated the rules of the gang first.

Mariscal reviewed the wilas found in the cell of Nunez and Ramirez, and was able to gather gang intelligence from them that formed the basis for some of his

opinions. In particular, he looked for an active tier roster, which was a list of active gang members within a certain area of the jail. One of the wilas was such a roster; Gutierrez was on the list of active gang members within the jail.

From one of the wilas that was seized, Mariscal was able to form an opinion concerning whether defendants were cleared following their arrival in the county jail. In the wila, it was reported they were under investigation, both had submitted their full accounts of what occurred, and Villanueva's cousins had submitted reports about what took place. If defendants had not been cleared of this incident, they would have been removed from the gang setting and gang housing long before trial, which was almost three years after the homicide. Instead, they had been active, and functioning as part of the gang, the entire time. This indicated the gang investigated the incident and concluded either Villanueva was justifiably killed or defendants did not kill him.

The fact defendants were cleared was "extremely important" to Mariscal's opinion as to whether the Norteño gang benefited from the crime. When two active Norteños kill another active Norteño and do not suffer penalties for it from the gang, it sends a strong message to the remainder of the gang that members will follow the gang's rules or be "dealt with up to murder." Someone considered a degenerate will not be allowed to function within the gang. The gang thrives off of fear and intimidation, within both the community and its own members. That is how the gang keeps its members functioning, committing crimes, and working for the benefit of the gang.

## II

### Defense Evidence

On May 25, Alicia Gutierrez resided in the 200 block of Angelus Street. That day, there was a big party next door. Alicia could tell there were a lot of gang members present, because they had head bandanas and wore red. [N.13]

[N.13] Alicia, who was not a gang member, did not like gangs.

Alicia saw two people arguing angrily on the sidewalk, in front of the empty building, for about five minutes. Perhaps 100 people were watching, but none intervened. Alicia could not describe the two who were arguing because they were not turned toward her, but one, who was wearing a white shirt and hat, was taller and chunkier than the other.

The two started shoving each other while the people around them just watched and egged them on. The two then went into the backyard of the vacant duplex. They went by themselves, with the bigger man walking first, but after a few minutes about 20 people went back with them. At that point, Alicia returned to her apartment. She could hear them continuing to argue, and she saw them pushing and shoving each other. They were almost to the end of the backyard, close to the alley. The people who followed them back were closer to the front of the duplex. They were watching, but making no effort to stop the altercation.

The pushing went on for a couple of minutes. Alicia could see fists going up. She did not see anybody with a weapon, although she did see one of them reach into his waistband area. She did not know which one. The fighting went on for a couple of minutes, then she heard gunshots. She heard one shot, then a half-second pause, then another shot, and "then they were on top of each other." Then there was a

11

longer pause and a final shot. She believed she heard at least five or six shots altogether.

During the course of his investigation at the scene of the shooting, Detective Tosta found bullets and bullet holes in the south fence line of the property. They ranged from 15 to 27 inches above the ground, and from 13 feet 9 inches to 18 feet 6 inches west of the east fence line. There were also several bullets, bullet holes, and ricochet marks in the building directly south, across the alley from the fence. They ranged from four feet to nine feet three inches above the ground.

On May 28, Detective Bertram interviewed Debbie Dunuan (Villanueva's mother) and Irma Bernal. Both concluded Tommy had some complicity in Villanueva's death due to numerous telephone calls Tommy made to Villanueva, insisting he come to the barbecue. During the neighborhood canvas that was conducted after the shooting, however, several residents reported overhearing individuals present at the party say defendants were the ones responsible for shooting Villanueva. Even those who suspected Tommy was involved clearly identified defendants as being "the responsibles."

Tapia's story about what happened evolved and changed during the course of his interview with Bertram and Bunch. When Bertram and Bunch went to Tapia's house, they discovered he had lied about where the gun had been stored. They did not discover anything to change Tapia's assertion Gutierrez had the firearm when he went to the location of the shooting, however.

Gunsmith Paul Mangelos testified as an expert on firearms in general and Glocks in particular. He explained that a .40–caliber Glock is a semiautomatic firearm, meaning it has a clip or magazine; and ejects a spent shell, feeds in a new cartridge, and fires a bullet each time the trigger is pulled. Changing one part on the gun makes it fully automatic; conversion kits are available on the Internet, although converting the gun to fully automatic is not legal in California. With a fully automatic firearm, one trigger pull may fire multiple rounds. A fully automatic Glock can fire approximately 1,200 rounds per minute, meaning it should fire 13 shots in less than a second. While firing, the gun will be hard to control and will be moving due to recoil. Someone hearing a fully automatic Glock being fired will not be able to determine how many rounds were fired.

Gutierrez, who was 31 years old at the time of trial, testified that he had been acquainted with Perez for about 25 years. The two had a hostile relationship, because Perez had molested Gutierrez's cousin when she was about seven years old. As a result, Gutierrez and Perez had had a number of fights, most of which were won by Perez. These had nothing to do with a gang.

Gutierrez attended Tommy's wedding reception. A lot of his family members were there, and they all were talking and having a good time.

It was kind of hot inside the Grange Hall, so at some point, defendants went outside to get some fresh air. Perez, Villanueva, and possibly more men approached. Prior to this time, Villanueva and Gutierrez had had some problems. Villanueva had "pretty much acted stupid toward[ ]" Gutierrez, although Gutierrez did not know why. Also prior to this time, Gutierrez had been in a lot of fights, mostly because of the people with whom he associated. At the time of the wedding reception, he was affiliated with a Norteño gang, as were Villanueva and Perez. Gutierrez was not angry at Perez about whether he was in or out of a gang; that had nothing to do with anything.

12

Perez approached Gutierrez and asked to talk to him, indicating kind of toward the back. Gutierrez was willing to go with Perez even though he did not think they were going to talk, but Saldana said no, that they could talk right there. Perez then punched Gutierrez in the face. Gutierrez stumbled back, then got up and started fighting with Perez. At some point, Gutierrez saw Saldana on the ground. Villanueva kicked Saldana in the face while Saldana was down. Saldana did not appear to be conscious.

Gutierrez and Perez continued fighting, and a large group of people surrounded them. Tommy and Eloisa then came out and broke it up. Eloisa was upset and accused Gutierrez of disrupting her wedding. Saldana had been down for two or three minutes; Gutierrez helped him up and they both left. They were already gone by the time the fight started across the street. They had been at the reception for two to three hours when they left, during which time they had no problems with Perez and Villanueva. Gutierrez considered this "just another fight"; he was not out for revenge afterward, despite what happened to Saldana.

Gutierrez did not see Villanueva, and was not looking for him or Perez, between the date of the wedding reception and the day of the shooting. He did not even know Villanueva was in town. As of the day of the shooting, Gutierrez was living with his mother on the north side of Turlock, across town from Angelus Street. He did not own a .40–caliber Glock, and never left a gun with Tapia. He did leave some marijuana at Tapia's house, however, because Gutierrez's mother would not allow it at her house. The marijuana was about the size of a brick, and was wrapped with plastic wrap inside cloth. Gutierrez took it to Tapia's house about a week before picking it up.

Gutierrez had been friends with Moses Rodriguez, but he did not know about or attend the celebration at the cemetery. He contacted Tapia because he had a buyer for the marijuana and wanted to pick up the package. The plan was for defendants to pick it up, then go to Ranch Burger, a restaurant off Lander, where they would meet the buyer and also get something to eat.

Tapia lived on Angelus Street, about three blocks from where the shooting took place. On the way there, defendants did not discuss Villanueva and had no plans to confront him. Defendants picked up Tapia in the white Nissan, which was registered to a relative of Gutierrez's wife, but on which Gutierrez had taken over the payments. Gutierrez was driving. Gutierrez remained in the car; he had telephoned Tapia earlier, and Tapia came out with the marijuana. Tapia did not provide Gutierrez with a gun, and Gutierrez did not show one to Tapia. Saldana did not have any gun that Gutierrez saw. There was no discussion about Villanueva.

Once Tapia got in the car, the plan was to go eat at Ranch Burger, which was about half a mile to a mile away. As they drove down Angelus, they saw 70 to 80 people in the street and in front of the houses. When Tapia saw Tommy, he told Gutierrez to stop. He said he wanted to see if Tommy had any new Jordans. Gutierrez pulled over. Tapia got out of the car and went toward the carport, where Tommy was located. Defendants also got out. Alcohol was being served, and Gutierrez accepted the offer of a beer. Defendants were not angry; Gutierrez did not see Villanueva.

Defendants stood by the opening in the fence, watching two men play dice on the sidewalk. The plan was for Tapia to look at the shoes, then he and defendants

13

would go on and eat, and Gutierrez would get rid of the marijuana. They had been there for about five to 10 minutes when Gutierrez noticed Villanueva approaching. Villanueva was wearing a jacket; he took it halfway off, then a light-complected Hispanic male stopped him and they argued a bit. Gutierrez did not know who the man was. The man was telling Villanueva just to let it go, that it was not the time or place.

Villanueva went up to Gutierrez and said, "Let me holler at you." Villanueva did not exchange words with Saldana or offer to shake hands. Gutierrez did not believe it was going to be a friendly talk, but he said, "All right." Villanueva then walked through the gate and Gutierrez followed. Gutierrez thought there would probably be a fight. He did not hear anyone yell at Darnell Lambert.

About 25 or 30 people followed them into the backyard. Villanueva handed his hat and jacket to someone. He then turned around and rushed Gutierrez. Villanueva swung at Gutierrez, so they started to fight. There were no words exchanged, either out front or in the backyard. Gutierrez did not know where Saldana was at that point. No one tried to separate the combatants.

Gutierrez and Villanueva fought for a minute, then Gutierrez turned away, although he did not completely turn his back on Villanueva. He was worried about what the people behind him, many of whom he did not know, might be doing. Gutierrez and Villanueva were both breathing hard from trading punches. Gutierrez, who was unarmed, thought Villanueva was trying to catch his breath, but the next he knew, he looked up and there was a pistol in his face. Gutierrez did not know from where Villanueva had produced the gun, but he feared for his life and so he grabbed it. Villanueva had his finger on the trigger at the time.

The two men wrestled for the gun, and Gutierrez fell over a shopping cart. He went down on his back, and Villanueva fell on top of him. They landed hard, and the gun came loose. Both men got to their feet and went for it. Gutierrez bent down, and as he was picking it up, Villanueva kicked him in the face. Gutierrez's finger was on the trigger when he got kicked, and he unintentionally fired. He did not mean to shoot Villanueva. Gutierrez only pulled the trigger one time, but bullets came out "kind of like a machine gun." There was no pause between any of the shots. Gutierrez could not control the gun, which was going off as it was being raised. Villanueva turned and fell. Gutierrez could not tell if he was shot. Neither Gutierrez nor anyone he saw put the gun to Villanueva's head and pulled the trigger.

Gutierrez's ears started ringing when the gun went off, and he was "kind of blacked out" and had blurred vision from the kick. Everyone was screaming, and he dropped the gun and ran. He went to his car, and Saldana also got in. [N.14] Gutierrez did not know where Tapia was. Gutierrez dropped Saldana off by a church and left. He never made it to Ranch Burger or to deliver the marijuana.

[N.14] Saldana had not been involved in the fight in any way.

Gutierrez was afraid for his wife and children. He feared both retaliation and the police. He left Turlock and ended up in San Jose. He burned the car not to destroy evidence, but because the registered owner could not make the payments. He himself was burned while doing this.

Gutierrez was arrested in Sacramento. Once he was in custody in Stanislaus County, he learned that as someone affiliated with the Norteño gang who came

14

into custody for allegedly hurting another Norteño, he was supposed to answer a number of questions. Saldana actually wrote the wila bearing Gutierrez's name, but Gutierrez provided the information on it. Answering the questions was mandatory.

Gutierrez was not aware of any difference between being affiliated with a gang and being a gang member. On March 22, he considered himself a Norteño gang member. Respect was important to him as a gang member, including with regard to the way his gang member peers viewed him.

Gutierrez explained that to a gang member, a degenerate is someone who is no longer associating with the gang. It is not a bad thing. A degenerate can "hang out" with an active member. Gutierrez was not sure what happens when a degenerate disrespects an active gang member in public in the presence of other gang members. For the gang member who is disrespected in public to do nothing but walk away may lead to repercussions such as discipline. However, Gutierrez would not necessarily be looked on as a coward or as letting the gang down if he let a degenerate punch him in front of other gang members and then just walked away.

Gutierrez denied that either the fight at the wedding reception or the shooting had anything to do with a gang. Perez molested Gutierrez's cousin when she was seven years old, 20 years or more ago. A known child molester cannot affiliate with Norteños, but only the family was aware of the molestation. Villanueva previously threatened Gutierrez's family and pulled guns on him. The information contained in the wila concerning what Villanueva had done was accurate. It was not Gutierrez's attempt to clear himself for an unauthorized killing of a Norteño; he did not feel threatened in any way by the Norteño gang after killing another Norteño without authorization from the gang.

Saldana testified that he was 26 years old at the time of trial and had lived with Gutierrez all his life. He did not have a good memory of what happened at the wedding reception, because he was knocked out. He recalled Gutierrez and Perez having words outside the reception hall, and Perez saying to Gutierrez, "Let's talk," and motioning with his head. Saldana told Gutierrez that if Perez had something to say, he could say it right there. Because of past problems, Saldana assumed they were going to fight, and he did not think they should be fighting right then and messing up Tommy's wedding. Saldana recalled there being a fight between Gutierrez, Perez, and Villanueva, but did not remember who threw the first blow or how long he himself was unconscious. He just remembered walking to the car afterward and leaving.

In May 2008, Saldana was living on Geer, in Turlock, with his wife and son. On May 25, he went to his mother's house and did some yard work for her. He then drove with Gutierrez to Tapia's house. Saldana did not know anything about any marijuana until he saw the package and asked what was in it. There was no talk about the fight at the wedding reception or doing anything to Villanueva. Saldana did not even know if Villanueva was in Turlock that day and knew nothing about any barbecue or anything going on at the cemetery. He did not conspire with Tommy or anyone else to try to get Villanueva to be at the barbecue. Saldana was not armed and did not see a gun possessed by anyone.

After leaving Tapia's house, they were going to go eat at Ranch Burger off of Lander. They stopped on Angelus, however, because Tapia saw Tommy and wanted to see what new shoes he had. Tapia walked up to Tommy, while Saldana and Gutierrez got out of the car and walked over to where everyone else was, in

15

front of the duplexes. Saldana did not recognize anyone there.

Saldana had never had a physical encounter with Villanueva other than at the wedding reception. As he and Gutierrez stood by the gate, Saldana heard Villanueva arguing with a man Saldana did not know. The man told Villanueva to let it go. Villanueva was looking in the direction of Saldana and Gutierrez.

Saldana and Villanueva did not speak to each other, but Villanueva told Gutierrez, "Let me holler at you," and then walked into the backyard. There were 40 or 50 people around, and Saldana understood it to be a challenge to fight. He did not hear Eloisa yell anything.

Gutierrez followed Villanueva into the back, as did people who had been standing there. As they walked to the backyard, Villanueva took off his jacket, hat, and chain. Everyone formed a circle around Villanueva and Gutierrez. Villanueva handed his stuff to someone, then turned around and rushed Gutierrez. Villanueva threw the first punch, then they started fighting. Saldana did not try to help Gutierrez, because it was one on one. Although Gutierrez was outweighed, Saldana was not afraid for him because Gutierrez could hold his own. No one else tried to intervene, but instead just cheered the fighters on. Villanueva was landing the most punches.

There was a pause in the fight, then Saldana saw Villanueva pull a pistol from his waistband and put it in Gutierrez's face. Gutierrez quickly grabbed it. He and Villanueva started wrestling for it and tripped over a shopping cart. Gutierrez fell back and Villanueva fell on top of him, and the gun came loose. Gutierrez and Villanueva scrambled to their feet, looking around, and Gutierrez went for the pistol. He was bent over, picking up the gun from the ground, when he got kicked in the face. Saldana saw Gutierrez come up with the gun and heard seven or eight shots fired all together. [N.15] Saldana saw Villanueva get hit and kind of spin around. It appeared to Saldana that when the firearm discharged, Gutierrez was defending himself.

> [N.15] Saldana was guessing at the number of shots. There was no pause, like Alicia testified; "[w]hen the gunshots stopped, they stopped."

The gunshots frightened Saldana, so he turned around and ran out of the backyard. When he got to the street, he saw Gutierrez running out of the backyard toward the car. Gutierrez was holding his face. He did not have a gun.

Saldana denied shooting Villanueva, setting him up, or being part of a plan to lure him into the backyard. He admitted being a Norteño gang member, but denied the shooting was gang related.

Saldana admitted writing in the wila that he was told by some of the "younger homies" that they made up a gang called Turlocos, but some individuals from Varrio West Side Turlock, including Villanueva, told them they were not allowed "to represent it" because the only gang in Turlock was VWST. Saldana stated in the wila that he was told the whole purpose of starting Turlocos was to unite all the youngsters who were fighting among themselves, but the individuals he mentioned started jumping the "younger homies." As a result, Saldana told the individuals from VWST that that was "red on red" and "not cool." Ever since then, Villanueva and the others did not like him. The wila related how Villanueva, Bullet G, and some of the others told Saldana's wife they were going to kill Saldana and Gutierrez. It also related that Villanueva tried to start a fight with Saldana and

1

2    Gutierrez three times at a wedding. At the end of the wedding, Villanueva called
     some of his friends who were known dropouts and degenerates, and they pulled up
     in a car driven by Anthony Fuentes ("Chubbs"), who "snitched" on Saldana for
3    carjacking in 2004. Perez, Bullet G, and a number of others surrounded Saldana
     and Gutierrez, and Saldana was struck and knocked out by Villanueva, who then
     continued to kick him in the face while Saldana was unconscious.
4

5    Everything Saldana wrote in the wila about Villanueva was accurate, but Saldana
     did not hate him at the time of the shooting. Saldana denied ever making a
6    shooting gesture at Villanueva. He attempted to listen to everything to which the
     prosecution's gang experts testified. He did not know all of the "stuff" they said
     about the Norteño gang.
7

8    People v. Gutierrez, No. F062970, 2013 WL 4523566, at *1–14 (Cal. Ct. App. Aug. 26, 2013).

9    **III.    DISCUSSION**

10        A.    Jurisdiction

11        Relief by way of a petition for writ of habeas corpus extends to a person in custody

12   pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

13   treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor,

14   529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

15   guaranteed by the United States Constitution.  The challenged conviction arises out of the

16   Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28

17   U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

18        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

19   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

20   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

21   filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

22   and is therefore governed by its provisions.

23        B.    Legal Standard of Review

24        A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

25   the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

26   that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

27   determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

28   based on an unreasonable determination of  the facts in light of the evidence presented in the State

17

1    court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

2    Williams, 529 U.S. at 412-413.

3         A state court decision is "contrary to" clearly established federal law "if it applies a rule

4    that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

5    of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

6    different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-

7    406 (2000).

8         In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

9    explained that an "unreasonable application" of federal law is an objective test that turns on

10   "whether it is possible that fairminded jurists could disagree" that the state court decision meets

11   the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an

12   unreasonable application of federal law is different from an incorrect application of federal

13   law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a

14   writ of habeas corpus from a federal court "must show that the state court's ruling on the claim

15   being presented in federal court was so lacking in justification that there was an error well

16   understood and comprehended in existing law beyond any possibility of fairminded

17   disagreement." Harrington, 131 S.Ct. at 787-788.

18        The second prong pertains to state court decisions based on factual findings.  Davis v.

19   Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under §

20   2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

21   petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

22   facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539

23   U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable

24   when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see

25   Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543

26   U.S. 1038 (2004).

27        To determine whether habeas relief is available under § 2254(d), the federal court looks to

28   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

18

1   Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

2   2004).  "[A]lthough we independently review the record, we still defer to the state court's

3   ultimate decisions."   Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

4       The prejudicial impact of any constitutional error is assessed by asking whether the error

5   had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

6   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120

7   (2007)(holding that the Brecht standard applies whether or not the state court recognized the error

8   and reviewed it for harmlessness).

9       C.    Review of Petition

10      Petitioner claims: 1) Defense counsel rendered ineffective assistance for various acts and

11  omissions; 2) Defense counsel rendered ineffective assistance; the prosecutor committed

12  misconduct, and the evidence was insufficient to support the conviction for first degree murder;

13  3) The trial court erred by admitting evidence of gangs, and Petitioner denied a fair trial when

14  photos of the victim were displayed in court in front of the victim's mother; 4) The prosecution

15  committed misconduct by suppressing, withholding or destroying various items of evidence; 5)

16  Petitioner was denied a fair trial due to juror misconduct; 6) The trial court erred by failing to

17  exclude the coerced testimony of prosecution witness Jorge Tapia; 7) Allowing the gang expert to

18  testify to Petitioner's prior bad acts violated his Sixth Amendment right to confrontation and his

19  federal due process right to a fair trial; 8) The gang expert's testimony concerning the prior bad

20  acts of Petitioner and his codefendant constituted unreliable hearsay that was more prejudicial

21  than probative in violation of his due process right to a fair trial; 9) The trial court erred by failing

22  to redact highly prejudicial statements from the wila written by Petitioner; 10) The prosecutor

23  committed misconduct; 11) The evidence was insufficient to support the finding that the offense

24  of murder was committed for the benefit or, at the direction of, or in association with, a criminal

25  street gang with the specific intent to promote, further, and assist in criminal conduct by gang

26  members; and 12) The trial court violated Petitioner's rights by imposing a restitution fine

27  without conducting a hearing on his ability to pay.  (Doc. No. 1 at pp. 5-50; Doc. No. 14 at pp. 2-

28  20.)

1            *1.  Claim One – Ineffective Assistance of Counsel*

2            Petitioner first alleges he was denied effective assistance of trial counsel for various acts

3    and omissions.  Some of his subclaims were presented in his habeas petitions to the state courts;

4    however, most of the instances of alleged ineffective assistance were not presented to the state

5    courts and are therefore unexhausted.  In any case, none of the claims have merit.

6            *a.  Federal Standard*

7            Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

8    Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

9    counsel are reviewed according to Strickland's two-pronged test.  Miller v. Keeney, 882 F.2d

10   1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also

11   Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or

12   constructively denied the assistance of counsel altogether, the Strickland standard does not apply

13   and prejudice is presumed; the implication is that Strickland does apply where counsel is present

14   but ineffective).

15           To prevail, Petitioner must show two things.  First, he must establish that counsel's

16   deficient performance fell below an objective standard of reasonableness under prevailing

17   professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, Petitioner

18   must establish that he suffered prejudice in that there was a reasonable probability that, but for

19   counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 694.  A "reasonable

20   probability" is a probability sufficient to undermine confidence in the outcome of the trial.  Id.

21   The relevant inquiry is not what counsel could have done; rather, it is whether the choices made

22   by counsel were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

23           With the passage of the AEDPA, habeas relief may only be granted if the state-court

24   decision unreasonably applied this general Strickland standard for ineffective assistance.

25   Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

26   federal court believes the state court's determination under the Strickland standard "was incorrect

27   but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

28   Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

1   is "doubly deferential" because it requires that it be shown not only that the state court

2   determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

3   Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

4   state court has even more latitude to reasonably determine that a defendant has not satisfied that

5   standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule

6   application was unreasonable requires considering the rule's specificity.  The more general the

7   rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

8               *b.  Failure to Call Witnesses*

9          Petitioner first alleges that defense counsel failed to call Claudia Berrios, Tazminder

10  Dillon, Elpidio Garcia, Moses Martinez, Hannah Rendon, Darrell Lambert, Joseph Gonzalez,

11  Thomas Gonzalez, Priscilla Klee, and Suavecita Bernal as witnesses.  He claims he provided

12  counsel the names of these potential witnesses but counsel failed to investigate them or present

13  them at trial.

14         Petitioner raised this claim, with the exception of witness Priscilla Klee, in his state

15  habeas petitions.  The Stanislaus County Superior Court provided the last reasoned decision, as

16  follows:

> Petitioner contends he received ineffective assistance from trial counsel.
> Petitioner's first criticism of counsel's performance involves trial counsel's failure
> to call Darnell Lambert, Moses Martinez, Thomas Gonzalez and Suave Bernal as
> alibi witnesses.  Petitioner claims these witnesses would have testified that the
> victim pulled a gun on Petitioner and that Petitioner acted in self-defense by taking
> the gun from the victim and shooting him.  These allegations do not state a prima
> facie case for habeas relief.  The testimony from these witnesses would not have
> established a self-defense claim.  If anything, Ms. Bernal's testimony would have
> hurt Petitioner's case.  Moreover, Petitioner does not allege that trial counsel knew
> of these witnesses.

22  (LD 22 at 4-5.)

23         Petitioner speculates that the witnesses would have testified that the victim was actually

24  the aggressor, that it was the victim who led Petitioner to the backyard, that Petitioner acted in

25  self-defense when the victim pulled a gun from his waistband, and that Petitioner did not fire at

26  point blank range.

27         Respondent correctly states that Petitioner fails to present sufficient facts or evidentiary

28

21

1   support to rebut the presumption that counsel rendered effective assistance.  Petitioner's argument

2   as to what these additional witnesses would have testified, without more, is pure conjecture.  In

3   order to carry his burden, Petitioner "must name the witness, demonstrate that the witness was

4   available to testify and would have done so, set out the content of the witness's proposed

5   testimony, and show that the testimony would have been favorable to a particular defense." Day

6   v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).  Petitioner has failed to do so by providing any

7   affidavits or declarations from the putative witnesses.  Moreover, counsel's reasons not to call

8   these witnesses are completely unknown.  It is unknown whether counsel attempted to contact

9   them, what the results were, and what counsel thought about them.  Without any supporting

10  evidence, Petitioner's allegation is pure speculation.

11          In addition, the evidence that is available suggests the witnesses would not have testified.

12  Shortly after the shooting, the police canvassed the neighborhood looking for witnesses.  Very

13  few people would speak to them or offer any information; most refused to cooperate.  (RT 523;

14  760-61.)

15          Also, the physical evidence completely conflicted with Petitioner's version of events.

16  According to Petitioner, the victim pulled out the gun and held it to Petitioner's face.  (RT 1687-

17  89.)  Petitioner grabbed the gun and they struggled for it. (RT 1689, 1691-92.)  At some point,

18  Petitioner picked up the gun and put his finger on the trigger.  (RT 1693.)  The victim kicked at

19  him, he pulled the trigger once, and the bullets came out "kind of like a machine gun."  (RT

20  1694.)  Petitioner testified there were no pauses and he could not control the gun.  (RT 1696.)

21          All of the physical evidence belies Petitioner's version of events.  The victim sustained

22  seven gunshot wounds all over his body, front and back.  (RT 964-67.)  The victim's wounds

23  were inconsistent with a fully automatic firearm having been fired once.   The ammunition

24  casings recovered from the scene were for use in a semiautomatic firearm, and the rifling marks

25  were consistent with a semiautomatic .40-caliber Glock pistol.  (RT 692.)  A semiautomatic

26  firearm requires a trigger pull for each shot.  (RT 689-90.)  In light of the evidence, even if

27  counsel had called these witnesses and they did testify according to Petitioner's version of events,

28  they could not have altered the fact that Petitioner's version of events was not credible.

1   For the foregoing reasons, Petitioner fails to demonstrate that the state court decision was

2   unreasonable.

3             *c.   Ineffective Assistance of Appellate Counsel*

4   Petitioner briefly claims that appellate counsel was ineffective in failing to raise the

5   previous claim of ineffective assistance of trial counsel.

6   In challenges to the effective assistance of appellate counsel, the same standards apply as

7   with the claims of ineffective assistance of trial counsel.  Smith v. Robbins, 528 U.S. 259, 285

8   (2000); Smith v. Murray, 477 U.S. 527 (1986).   In Smith, the United States Supreme Court

9   indicated that an appellate attorney filing a merits brief need not and should not raise every non-

10   frivolous claim.  Robbins, 528 U.S. at 288.  Rather, an attorney may select from among them in

11   order to maximize the likelihood of success on appeal.  Id.  As a result, there is no requirement

12   that an appellate attorney raise issues that are clearly untenable.  Gustave v. United States, 627

13   F.2d 901, 906 (9th Cir. 1980); see also Gillhan v. Rodriguez, 551 F.2d 1182 (10th Cir. 1977).

14   Petitioner's claim is without merit, because he fails to demonstrate that appellate counsel's

15   decision was unreasonable.  As discussed above, the ineffective assistance of trial counsel claim

16   is meritless, and appellate counsel cannot be faulted for failing to argue a meritless claim.  In

17   addition, in California, issues of ineffective assistance of counsel are preferably brought on

18   habeas review in order to enable trial counsel the opportunity to explain the reasons for his or her

19   conduct.  People v. Mendoza Tello, 15 Cal.4th 264, 266-67 (1997).  Therefore, Petitioner fails to

20   show that the state court rejection of this claim was unreasonable.

21             *d.   Bifurcation*

22   Petitioner claims counsel was ineffective in failing to request a bifurcated trial on the gang

23   enhancement.  He claims bifurcation was warranted because the gang evidence was highly

24   prejudicial.

25   Counsel's reasons are not in the record, therefore, the Court must consider all possible

26   arguments or theories that may have supported the state court decision.  Here, it is likely counsel

27   did not make such a motion because it would surely have been denied.  Under California law, the

28   criminal street gang enhancement is attached to the underlying offense and is therefore

1    "inextricably intertwined with that offense." <u>People v. Hernandez</u>, 33 Cal. 4th 1040, 1048

2    (2004).  Again, counsel cannot be faulted for failing to bring a meritless motion.

3                         *e.   Prosecutor's Remarks*

4            Petitioner claims counsel erred by failing to object to the prosecutor referring to Petitioner

5    and his co-defendant as a "two man hit squad" and "gang superstars," and by failing to object to

6    the prosecutor's rephrasing of jury instructions during closing arguments.

7            Defense counsel's decision to object is a matter of trial tactics and strategy over which

8    counsel has a large degree of discretion, and "a court must indulge a strong presumption that

9    counsel's conduct falls within the wide range of reasonable professional assistance...." <u>Strickland</u>,

10   466 U.S. at 689.  In addition, "absent egregious misstatements, the failure to object during the

11   closing argument and opening statement is within the 'wide range' of permissible professional

12   legal conduct." <u>United States v. Necoechea</u>, 986 F.2d 1273, 1281 (9th Cir.1993).

13           Upon review of the challenged statements, the Court cannot find the state court rejection

14   of the claim to be unreasonable.  It is at least debatable whether the comments referring to the

15   defendants as a "two man hit squad" and "gang superstars" were fairly based on events in

16   evidence.  As to the prosecutor's discussion of the jury instructions during closing, attorneys are

17   free to discuss the jury instructions during closing and argue how the evidence relates to them.

18   Thus, Petitioner fails to demonstrate that the state court rejection of this ineffective assistance

19   claim was an unreasonable application of <u>Strickland</u>.

20                        *f.   Gang Expert's Reference to Religious Channels*

21           Petitioner argues that counsel should have objected when the gang expert testified that

22   Norteño gang members are discouraged from watching religious channels.  Again, counsel's

23   reasons are unknown so the Court is left to speculate.  Moreover, there is no evidence the

24   statement was false, and in any case, it was a minor comment within the entirety of the gang

25   expert's testimony concerning the manner in which Norteños enforce their rules in prison.  (RT

26   1053-56.)

27                        *g.   Victim Impact Statements*

28           Petitioner claims defense counsel allowed the prosecution to read victim impact

                                                    24

statements in violation of Cal. Penal Code § 1204.  Two statements were read, written by the victim's ex-fiancée and the victim's mother.  (RT 2135-39.)

Petitioner's argument is not well-taken, because the reading of victim impact statements is specifically authorized under California law.  "The language of [California Penal Code] section 1204 applies only to evidence of mitigating and aggravating factors, not generic victim statements."  People v. Mockel, 226 Cal.App.3d 581, 588 (1990).  Cal. Penal Code §§ 1170, 1191.1, and 1191.15 specifically provide and allow for the use of written victim impact statements.  Therefore, there were no valid grounds for defense counsel to object.

### h.   Waiver of Right to Jury Trial on Prior Conviction

Petitioner alleges counsel was ineffective in advising him to waive his right to a jury trial on his prior conviction.  He claims counsel then failed to object to the procedure by which the prosecutor amended the information to reflect Petitioner's prior conviction was for the lesser offense of carjacking rather than kidnapping during a carjacking.

Petitioner's claim is without merit.  He does not state what different procedure defense counsel should have insisted on, and it is clear from the documentary evidence that Petitioner had a prior conviction.  Whatever procedure defense counsel would have chosen, the result would have been the same.

Petitioner also claims his waiver of a jury trial on his prior was unknowing.  This claim is belied by the record.  The record reflects that Petitioner understood his right to jury trial on his prior.  Regardless, Petitioner does not show how he would have defended against the allegation in a jury trial any different from the court trial, or how he was prejudiced.

### i.   Evidence of Discipline by Gang

Petitioner argues that defense counsel did not allow him to present evidence that he and his co-defendant were not cleared by the Norteño gang for the shooting of the victim, contrary to what the gang expert testified.  Petitioner states he asked defense counsel to call a fellow gang member, Manuel Nunez, as a witness who would have testified that Petitioner and his co-defendant were disciplined by the gang for the shooting.  Petitioner states defense counsel refused, stating he did not want more gang evidence introduced because this would only inflame

1  the jury.

2  　　　As previously stated, in order to carry his burden, Petitioner "must name the witness,

3  demonstrate that the witness was available to testify and would have done so, set out the content

4  of the witness's proposed testimony, and show that the testimony would have been favorable to a

5  particular defense." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).  Here, it is unknown if

6  counsel spoke to the witness, what the witness stated, whether the witness would have

7  cooperated, whether he would have testified, and whether he would have testified favorably.

8  Without any supporting evidence, Petitioner's allegation is pure speculation.  In addition,

9  Petitioner fails to show that counsel's reasoning was not within the wide range of professional

10  assistance.

11  　　　　　*j.  Pathologist's Report*

12  　　　The pathologist testified that the victim was shot in the head at close range.  Petitioner

13  states there was no indication of this close range shot in the pathologist's report.  Petitioner claims

14  counsel should have moved to strike or suppress this statement.

15  　　　However, counsel did in fact cross-examine the pathologist concerning the report to the

16  effect that "[n]one of the gunshot wounds show evidence of close-range firing on the skin around

17  the entrance of the bullet holes." (RT 989-90.)  The pathologist responded that he did not find

18  evidence of gun powder on the skin indicating a close range shot, but he did find abrasions that

19  did indicate close range.  (RT 990-91.)  Given this testimony, Petitioner fails to show that a

20  motion to suppress or strike would have been successful, and ultimately fails to demonstrate that

21  the state court rejection of his claim was unreasonable.

22  　　　　　*k.  Evidence of Shoebox*

23  　　　Petitioner argues that counsel was ineffective in failing to object or move to exclude

24  evidence of a shoebox in J. Tapia's bedroom after it was discovered that the shoebox had been

25  lost.  He alleges that defense counsel sought the shoebox in order to perform testing on it to find

26  traces of marijuana, which would have been consistent with the defense theory that the shoebox

27  was used to transport marijuana rather than a gun.

28  　　　There is no indication that the shoebox was kept from the defense by the prosecution.  The

record shows that the shoebox was discussed during trial, and neither defense counsel objected

that they had never heard of the shoebox.  They did not bring any grievance to the trial court's

attention that they had desired to test the shoebox but were prevented from doing so by the

prosecution.

In addition, there is nothing to show that the shoebox would have provided any material

evidence for the defense.  Even if marijuana residue had been detected, it would not have

eliminated the possibility that Tapia had used it to transport the gun as he had stated.  Thus,

Petitioner fails to demonstrate any prejudice resulting from counsel's omission.

*l.   Jury Admonishments*

Last, Petitioner alleges defense counsel was ineffective in failing to object to the trial

court's admonishment to the jury prior to recess.  Rather than reminding the jury not to converse

amongst themselves or anyone else, the trial court merely stated "recall the admonishments" prior

to excusing the jury. (RT 147.)

Cal. Penal Code § 1122 provides:

(a) After the jury has been sworn and before the people's opening address, the court shall instruct the jury generally concerning its basic functions, duties, and conduct. The instructions shall include, among other matters, all of the following admonitions:

(1) That the jurors shall not converse among themselves, or with anyone else, conduct research, or disseminate information on any subject connected with the trial. The court shall clearly explain, as part of the admonishment, that the prohibition on conversation, research, and dissemination of information applies to all forms of electronic and wireless communication.

(2) That they shall not read or listen to any accounts or discussions of the case reported by newspapers or other news media.

(3) That they shall not visit or view the premises or place where the offense or offenses charged were allegedly committed or any other premises or place involved in the case.

(4) That prior to, and within 90 days of, discharge, they shall not request, accept, agree to accept, or discuss with any person receiving or accepting, any payment or benefit in consideration for supplying any information concerning the trial.

(5) That they shall promptly report to the court any incident within their knowledge involving an attempt by any person to improperly influence any member of the jury.

(b) The jury shall also, at each adjournment of the court before the submission of

the cause to the jury, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to conduct research, disseminate information, or converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them. The court shall clearly explain, as part of the admonishment, that the prohibition on research, dissemination of information, and conversation applies to all forms of electronic and wireless communication.

Cal. Penal Code § 1122.

In a lengthy trial, it becomes tedious and unwieldy to repeat these admonitions every time the jury is recessed.  Therefore, it is commonplace to stipulate that the admonishments not be repeated in full.  The attorneys did so in this case.  (RT 147.)  The trial court then advised the jury:

> Ladies and gentlemen, each break and every afternoon when you leave, I'll say something to the effect, "recall the admonition."  All I'm doing is telling you in shorthand to recall what I just read to you about the separate admonition, not to talk about the case, not to make up your mind, et cetera, et cetera. Okay?

(RT 147, 226.)

There is no question that counsel's stipulation was within the wide range of competent assistance.  In addition, Petitioner cannot demonstrate prejudice.  There is no indication in the record that the jury forgot the instruction, or that the jurors did not abide by the instruction.

### m.  Conclusion

In sum, Petitioner fails to show that counsel's performance was deficient or that he suffered prejudice as a result.  He has not shown that the state court rejection of this claim was contrary to or an unreasonable application of Supreme Court authority.  The claim should be rejected in its entirety.

### 2.  Claim Two – Prosecutorial Misconduct

In this claim, Petitioner raises various claims of prosecutorial misconduct, ineffective assistance of appellate counsel, and insufficiency of the evidence.  Petitioner alleges the prosecutor committed misconduct by telling the jury in closing argument that Petitioner and his co-defendant were a "two-man hit squad," that they were not "wannabes, rather gang superstars," and that the jury should "send a message to the Norteño street gang."

Petitioner's ineffective assistance of appellate counsel was previously discussed.  There is

28

no merit to his ineffective assistance of counsel claims.  Therefore, appellate counsel cannot be faulted for failing to raise those claims on appeal.  Moreover, ineffective assistance of counsel claims are preferably brought on habeas in California.

### a. State Court Decision

As to prosecutorial misconduct, Petitioner presented this claim on direct review to the Fifth DCA, where it was rejected in the last reasoned state court decision, as follows:

> Defendants contend they are entitled to a new trial due to prosecutorial misconduct. They say the prosecutor's remarks undermined their due process rights to a fundamentally fair trial, an admonition was not sufficient to cure the prejudice, and the trial court erred by refusing to grant a mistrial upon defense request. We conclude defendants received the relief they requested, and the trial court's admonition adequately addressed any impropriety.

> ### A. Background

> At the conclusion of his opening summation, the prosecutor stated:

>> "Everything you heard in testimony, everything I've been saying in this closing, the gang benefit, once again, with the clearance of Tito and Ramo in jail, what does that send, what message does that send to every other gang member out there who may dare to go to the aid of a degenerate.... What message is sent when a blatant, brazen, violent execution in broad daylight occurs, and the gang members are cleared?

>> "This is the fear and intimidation I talked about, the hallmarks of the Norteño gang, what the Norteño gang needs in order to function the way they do, carrying out their primary activities on the citizens of Stanislaus County. That's one benefit. Second benefit, what does that do to the individual status of the two assailants?

>> "You know, are Tito and Ramo fledgling gang members? Are they wannabes? After committing this type of crime, justifying it the way they did, they are gang superstars at this point. Other gang members are going to see this. The Norteño gang, once again, is proven as a violent, predatory criminal street gang. *And now it is time for you all to send a message to the gang. You won't tolerate it.*

>> "This is not just another dead gang member. It's not a little trophy for the community. A gang member is dead. *This is a human being and a message that must be sent to the Norteños through you 12.* You heard the evidence. You gave them their day in court, and you convicted them of the righteous charge of premeditated, first-degree murder with the two enhancements. Thank you very much." (Italics added.)

> Counsel for Gutierrez then began his summation. After the lunch recess, the following took place outside the jury's presence:

>> "[COUNSEL FOR GUTIERREZ]: Yes, your Honor. I reflected over lunch, I didn't want to draw any more attention to it, but ... I'd ask the Court to

consider, either now or ongoing, a defense motion for a mistrial *and/or* a possible admonition to the jury about that this is really not a referendum.

That's not [the prosecutor's] words, but I think what was objectionable was his last comment, and I don't want to waive the objection about they need to send a message, and I think take a stand, you know, against gangsters. And I think that that's impermissible argument, and it's designed to incite and inflame the jury and have them forget their purpose and role in these proceedings. [¶] ... [¶]

"[COUNSEL FOR SALDANA]: I thought the same thing. The verdicts should be based on the evidence and should not be based on some kind of moral stance or some view that they have to take a stand against gang members in general. I don't think that is their argument, so I would join in that motion. [¶] ... [¶]

"[PROSECUTOR]: Absolutely permissible argument, your Honor. And any type of admonition against the prosecution will stamp approval on the defense argument to the detriment of the prosecution....

"[COUNSEL FOR SALDANA]: The problem with [the prosecutor] is he got a little personal. You, Members of the Jury, you got to send a message to your fellow citizens, and that is crossing over the line.

"THE COURT: Here's my position. I agree with defense. I don't think that's appropriate argument, however, there was not a timely objection made; therefore, the motion is denied. [N.46] [¶] ... [¶] ... I've made my ruling, and I will advise [the prosecutor] not to make that type of argument in his rebuttal. [¶] ... [¶]

> [N.46] The court had warned counsel at the beginning of trial that it expected objections to be timely made.

"[COUNSEL FOR GUTIERREZ]: ... [T]here's kind of an admonishment that the Court is supposed to essentially yell at the prosecutor. It's not something that has to happen right now—[¶] ... [¶]

"THE COURT: Here's what the book indicates, and when I say the book, I'm talking about California Criminal Law of Procedure and Practice 2010 edition, Section 30.27, 'Counsel should be specific in objecting to misconduct at any stage of the trial, especially during closing argument. Conduct may be found improper by the Court on appeal, but the error may be held to have been waived by the failure to object or by an ambiguous objection on the ground that the effect of the misconduct could have been cured by timely admonition.'

"[COUNSEL FOR GUTIERREZ]: *I'm asking for an admonition, your Honor*.

"THE COURT: You're asking me to bring emphasis to that statement now?

"[COUNSEL FOR SALDANA]: *Now, yes, I am*. [¶] ... [¶]

"[COUNSEL FOR GUTIERREZ]: If the Court would consider it, that's all, you know, it doesn't have to be right now at this point, but I do want to

raise the issues, and I think it's still timely.

"THE COURT: Well, *let me ask defense counsel, if I were to give them an admonition, what would you want me to say to them?*

"[COUNSEL FOR GUTIERREZ]: It is improper to suggest that your role in these proceedings as the trier of fact is to, quote, send a message to anybody or on any issue.

"[COUNSEL FOR SALDANA]: Yeah, and that they should base their decision on the evidence and nothing more.

"[COUNSEL FOR GUTIERREZ]: The evidence and the Court's instructions but not for any other purpose.

"THE COURT: Can you find in the transcript that part where [the prosecutor] was telling them they need to send a message?

"(Whereupon, the requested portion was read back.) [¶] ... [¶]

"[COUNSEL FOR GUTIERREZ]: Well, then, that's it, your Honor, this sending a message.

"[COUNSEL FOR SALDANA]: I remember. As I recall you sent a message. The jury sent a message. That's what I found objectionable.

"THE COURT: Here's what I'm going to do. When they come back in, I'm going to tell them that [the prosecutor] made an argument that the Court considers improper and that part of the argument was that the jury is to send a message, and that their job is not to send messages. Their job is decide what the facts are and to follow the law and come to a just and final conclusion.

"[COUNSEL FOR GUTIERREZ]: *That's fine.*

"[COUNSEL FOR SALDANA]: *Sounds very good to me.* [¶] ... [¶]

"THE COURT: All right. All the ladies and gentlemen of the jury are back.

"Ladies and Gentlemen, there's a matter I want to address the jury about. [The prosecutor] made some comments during this final argument this morning that the Court considers to have been improper. When he asked you to send a message to the community, or words to that effect, and any similar type of argument, that was an improper argument, and I'm admonishing you to disregard it. It's not your job to send a message to anybody. It's your job to decide what the facts are, apply the facts of [sic ] the law and reach a fair and just verdict. Okay?" (Italics added.)

*B.   Analysis*

"Prosecutorial misconduct may constitute an appropriate basis for a mistrial motion. [Citation.]" (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1154.) "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with

considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854; accord, *People v. Bolden* (2002) 29 Cal.4th 515, 555.)

Settled standards govern review of misconduct claims. "'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) "To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]" (*Ibid.*)

"Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) "When a claim of misconduct is based on the prosecutor's comments before the jury, ... "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citations.]" (*People v. Gonzales and Soliz, supra*, 52 Cal.4th at p. 305.) In making this determination, "we must view the statements in the context of the argument as a whole. [Citation.]" (*People v. Dennis, supra*, 17 Cal.4th at p. 522.) A showing the prosecutor acted in bad faith is not required. (*People v. Hill* (1998) 17 Cal.4th 800, 822–823.)

It is improper for a prosecutor to appeal to the passions or prejudice of the jury at the guilt phase of a criminal trial. (*People v. Cornwell* (2005) 37 Cal.4th 50, 92, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250; *People v. Fields* (1983) 35 Cal.3d 329, 362.) "[T]emperate speech[es] concerning the function of the jury and of the rule of law" have been found to be proper (*People v. Cornwell, supra*, 37 Cal.4th at pp. 92–93), as have "references to the idea of restoring law and order to the community" where such comments "were an appeal for the jury to take its duty seriously, rather than efforts to incite the jury" against the accused (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 511–512, 513). [N.47]  On the other hand, misconduct has been found where the prosecutor asked jurors to base their verdict on considerations outside the merits of the case, such as public opinion and the reactions of those closest to them. (*People v. Morales* (1992) 5 Cal.App.4th 917, 928.)

> [N.47] Isolated references to retribution or community vengeance, or arguing the jury should send a message or make a statement by returning a verdict of death, have been held not to constitute misconduct when made in the penalty phase of trial, so long as such arguments do not form the principal basis for advocating imposition of the death penalty. (*See, e.g.*, *People v. Brady* (2010) 50 Cal.4th 547, 586; *People v. Martinez* (2010) 47 Cal.4th 911, 965–966; *People v. Wash, supra*, 6 Cal.4th at pp. 261–262.)

We need not decide whether the prosecutor's "send a message" remarks crossed the line into impropriety: The trial court told jurors the argument was improper and explicitly "admonished the jury to disregard the comments; it is assumed the jury followed the admonishment and that prejudice was therefore avoided. [Citation.]" (*People v. Mendoza* (2007) 42 Cal.4th 686, 701.) "A jury will generally be presumed to have followed an admonition to disregard improper evidence or

comments, as '[i]t is only in the exceptional case that "the improper subject matter is of such a character that its effect ... cannot be removed by the court's admonitions." [Citation.]' [Citation.]" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 692.)

Defendants fail to persuade us this is such an exceptional case. Contrary to defendants' assertion that they did not receive the relief they requested because they asked for a mistrial and the trial court refused to grant one, the record shows they requested a mistrial and/or an admonition, and they agreed to the trial court's admonition as an alternative to their untimely mistrial request. (See *People v. Thompson, supra*, 49 Cal.4th at p. 130.) They expressly agreed to the trial court's proposed admonition—which it ultimately gave—and did not claim it was inadequate or seek any additional charge to the jury. (See *People v. Chatman* (2006) 38 Cal.4th 344, 385.)

Presuming, as we do, that the jury understood and obeyed the trial court's instruction to disregard the prosecutor's "send a message" remarks, we conclude the trial court did not err. Any prejudice was cured by its admonition. (See *People v. Tully* (2012) 54 Cal.4th 952, 1020.) The prosecutor's "isolated, brief remark, when viewed in the context of the entire argument, ... could not have inflamed the jury's passions to the point where the outcome of the trial was affected or the trial became fundamentally unfair." (*People v. Rundle* (2008) 43 Cal.4th 76, 162, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) This is simply not a case in which "improper comments and assertions [were] interspersed throughout trial and/or closing argument" (*People v. Pitts, supra*, 223 Cal.App.3d at p. 692), or where "the sheer number of instances of prosecutorial misconduct and other legal errors raises the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone" (*People v. Hill, supra*, 17 Cal.4th at p. 845).

Gutierrez, 2013 WL 4523566, at *44–47.

### b.   Federal Standard

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 171 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  It "is not enough that the prosecutor's remarks were undesirable or even universally condemned."  Id.  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)).  Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial, i.e., that absent the alleged impropriety, the verdict probably would have been different.

///

33

1              *c. Analysis*

2              Regardless of whether the prosecutor's remark to send a message to the gang was

3      improper, the claim is without merit.  The trial court admonished the jury that the statement made

4      by the prosecutor was improper and directed the jury to disregard it.  When a curative instruction

5      is given, it is presumed that the jury follows it and that no due process violation occurred.  Greer,

6      483 U.S. at 766.  No reason or evidence has been offered to show that the jury was not able to

7      follow the instruction in this instance.  Moreover, counsel for the defendants agreed that the

8      admonishment was sufficient to avoid prejudice to the defendants.  In addition, there was no

9      pattern of continuing misconduct.  The comments were an isolated instance that was immediately

10     thereafter addressed by the trial court, and the comments were stricken.  The jury was instructed

11     not to consider counsels' arguments as evidence.  (CT 981.)  Finally, as Respondent points out,

12     defense counsel responded to the prosecutor's argument in his own closing, thereby diluting any

13     prejudicial effect.  (RT 1944.)  See Darden, 477 U.S. at 182.

14             As to the remarks characterizing Petitioner and his co-defendant as a "two man hit squad"

15     and "gang superstars," these instances were not presented to the California Supreme Court and

16     are therefore unexhausted.  In any case, Petitioner fails to show how the remarks misstated the

17     evidence or that the remarks were not soundly based on the evidence.

18             Petitioner also claims the prosecutor committed misconduct by referencing a Norteño in

19     another criminal trial during his cross-examination.  This claim fails for the simple reason that it

20     was Petitioner's counsel who initially brought up the other murder trial, not the prosecutor.  (RT

21     1810-11.)  Petitioner fails to show how it was wrong for the prosecutor to cross-examine him on

22     the same topic brought up by defense counsel.

23             In sum, Petitioner fails to show that the state court determination that any error was

24     harmless was contrary to, or an unreasonable application of, Supreme Court authority.  The claim

25     should be denied.

26             *d. Insufficiency of the Evidence*

27             Within Ground Two, entitled "Prosecutorial Misconduct," Petitioner also claims the

28     evidence was insufficient to support his conviction for first degree murder since there was

1   evidence that the victim was shot in self-defense.  He claims there was insufficient evidence of

2   premeditation and deliberation.

3       The law on sufficiency of the evidence is clearly established by the United States Supreme

4   Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

5   307, the test on habeas review to determine whether a factual finding is fairly supported by the

6   record is as follows:

7       [W]hether, after viewing the evidence in the light most favorable to the
        prosecution, any rational trier of fact could have found the essential elements of
8       the crime beyond a reasonable doubt.

9   Id., at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of

10  fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to

11  habeas relief.  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by the elements defined

12  by state law.  Id. at 324, n. 16.

13      If confronted by a record that supports conflicting inferences, a federal habeas court "must

14  presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

15  such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

16  Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

17  conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

18      After the enactment of the AEDPA, a federal habeas court must apply the standards of

19  Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

20  2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

21  correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

22  477 U.S. 436, 459 (1986).

23      In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further

24  explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

25      makes clear that it is the responsibility of the jury - not the court - to decide what
        conclusions should be drawn from evidence admitted at trial. A reviewing court
26      may set aside the jury's verdict on the ground of insufficient evidence only if no
        rational trier of fact could have agreed with the jury. What is more, a federal court
27      may not overturn a state court decision rejecting a sufficiency of the evidence
        challenge simply because the federal court disagrees with the state court. The
28      federal court instead may do so only if the state court decision was "objectively

1     unreasonable."

2     Because rational people can sometimes disagree, the inevitable consequence of
       this settled law is that judges will sometimes encounter convictions that they
3     believe to be mistaken, but that they must nonetheless uphold.

4     Id. at 2.

5          After viewing the evidence in the light most favorable to the prosecution, it is clear that

6     any rational trier of fact could have found the elements of premeditation and deliberation.  As

7     correctly stated by Respondent, the California Supreme Court has defined "deliberate" as "formed

8     or arrived at or determined upon as a result of careful thought and weighing of considerations for

9     and against the proposed course of action."  People v. Memro, 11 Cal.4th 786, 862-63 (1995).  To

10    "premeditate" is to consider it beforehand.  Id.  "Premeditation and deliberation can occur in a

11    brief interval. . . . The test is not time, but reflection . . . . Thoughts may follow each other with

12    great rapidity and cold, calculated judgment may be arrived at quickly.  Id. at 863 (quoting People

13    v. Bloyd, 43 Cal.3d 333, 348 (1987)).  Evidence of deliberation and premeditation will fall into

14    one or more of three categories: motive, planning and manner of killing.  People v. Silva, 25

15    Cal.4th 345, 368 (2001).

16         Here, there was ample evidence of motive.  Petitioner and the victim had previously

17    fought at the wedding reception, which provided a motive for retaliation.  (RT 405-08.)  In

18    addition, Petitioner referenced the victim as a degenerate, and the gang expert testified that an

19    active gang member would be expected to retaliate forcefully against a degenerate who had

20    slighted him.  (CT 866; RT 1127.)  There was evidence of planning insofar as Petitioner gave

21    Tapia a gun to conceal and retain, and then return to him on the day of the party.  The manner of

22    killing also demonstrated deliberation and premeditation since the victim was shot 13 times

23    including one to the head at close range.  Petitioner's immediate flight, destruction of the vehicle,

24    and disappearance also showed planning and deliberation.  Given the evidence, the state court

25    could easily find the evidence supported the jury's finding.

26         *3.  Claim Three – Admission of Evidence and Courtroom Spectator Conduct*

27         Petitioner next argues that the admission of gang evidence and the display of photographs

28    of the deceased victim at trial in the presence of the victim's mother were prejudicial in violation

1   of his due process rights.  For numerous reasons, the claim is without merit.

2                    *a.  "Gang Evidence"*

3          First, Petitioner's allegations concerning the admission of "gang evidence" are entirely

4   vague.  Petitioner does not specify which gang evidence was so prejudicial as to violate his rights.

5   The case centered on a murder which occurred between gang members during a gang event.

6   There is no question that gang evidence in general would be relevant and admissible.

7          Second, Petitioner's claim would normally sound only in state law and, therefore, would

8   not be cognizable in federal habeas proceedings.  A federal habeas corpus court has no authority

9   to review a state's application of its own laws, but rather must determine whether a prisoner's

10  constitutional or other federal rights have been violated.  Estelle v. McGuire, 502 U.S. 62, 67-68

11  (1991); Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990).  Generally, the admissibility of

12  evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding.

13  Estelle, 502 U.S. at 67; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied*, 478 U.S.

14  1021 (1985).

15         Third, a federal court's inquiry is limited to whether the evidentiary ruling "resulted in a

16  decision that was contrary to, or involved an unreasonable application of, clearly established

17  Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

18  With respect to the admission of evidence, there is no Supreme Court precedent governing a

19  court's discretionary decision to admit evidence as a violation of due process.  In Holley v.

20  Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009), the Ninth Circuit stated:

21             The Supreme Court has made very few rulings regarding the admission of
               evidence as a violation of due process. Although the Court has been clear that a
22             writ should be issued when constitutional errors have rendered the trial
               fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that
23             admission of irrelevant or overtly prejudicial evidence constitutes a due process
               violation sufficient to warrant issuance of the writ. Absent such "clearly
24             established Federal law," we cannot conclude that the state court's ruling was an
               "unreasonable application."   [Citation omitted.] Under the strict standards of
25             AEDPA, we are therefore without power to issue the writ . . . .

26  Hence, the state courts' rejection of Petitioner's claim could not have been "contrary to, or an

27  unreasonable application of, clearly established" United States Supreme Court authority, since no

28  such "clearly established" Supreme Court authority exists.  28 U.S.C. § 2254(d)(1).

Nevertheless, there can be habeas relief for the admission of evidence when the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice." Perry v. New Hampshire, 565 U.S. 228, 237 (2012).  However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at 920.

Petitioner has failed to show that no permissible inferences existed that the jury might draw from the challenged evidence; accordingly, the claim does not rise to the level of a federal constitutional claim and is, therefore, merely an issue of state law that is not cognizable in these proceedings. Moreover, the challenged evidence was relevant and probative of various elements of the gang enhancements with which Petitioner was charged.  Under California law, the gang-related sentence enhancement required proof that the crime for which Petitioner was convicted was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members…."  Cal. Pen. Code § 186.22(b)(1).  In order to prove the other gang-related enhancement, the prosecution had to establish that Petitioner committed the offense while "an active participant in a criminal street gang…and the murder was carried out to further the activities of the criminal street gang."  Cal. Pen. Code § 190.2(a)(22).  Even a cursory review of the gang-related evidence contained in the trial record shows that this evidence was relevant to establishing the above-referenced enhancements.

### b.  Photos of Victim

Petitioner alleges that the showing of "gruesome photos" of the victim at trial while the victim's mother was present caused him prejudice at trial because jurors were able to view the "traumatic effect it had on her as she walked out of the courtroom in tears."  (Pet. at 36.)

This claim is also unsupported.  As Respondent points out, it appears there were three photographs shown of the victim.  One was a photograph of the victim at the crime scene shown to witness Eloisa Gonzales.  (RT 204-05, 213-14.)  The other two were shown during the

pathologist's testimony, however, those two were introduced by counsel for co-defendant.  (RT 987-89.)  Notably, Petitioner's counsel stated "no objection."  (RT 987.)  There is nothing in the record that demonstrates these photographs were in any way gruesome.  There is nothing in the record indicating a particular response from the victim's mother.  There is also nothing in the record showing the jury had any reaction to the photographs being shown in the presence of the victim's mother.  Therefore, the claim is conclusory and unsupported.

Moreover, the "[Supreme] Court has never addressed a claim that [] private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." Carey v. Musladin, 549 U.S. 70, 76 (2006).  Therefore, Petitioner cannot demonstrate that the state court rejection of this claim was contrary to, or an unreasonable application of, Supreme Court precedent.  28 U.S.C. § 2254(d).  The claim should be denied.

### 4.  Claim Four – Brady claim

Petitioner alleges the prosecutor committed a violation of Brady v. Maryland, 373 U.S. 83 (1963) when it destroyed, withheld, or failed to disclose material exculpatory evidence in bad faith.  He claims: 1) the prosecution withheld the victim's coat jacket that had been removed from the crime scene and relocated by Gonzalez; 2) the prosecution destroyed the shoebox that was used by Tapia to transport the weapon; 3) an in-camera hearing of an informant should have been transcribed and disclosed; 4) the prosecution withheld evidence regarding a payment agreement with E. Gonzalez for her participation in coming forward as a prosecution witness; and 5) the prosecution sent witness Tapia a threatening letter advising him that he would be prosecuted if he didn't testify.  (Pet. at 37-42.)

Petitioner presented his claim concerning the in-camera hearing in his habeas petition to the California Supreme Court.  He did not present the other four instances to the state courts. Therefore, they are unexhausted.  Nevertheless, the Court will address them as they are clearly without merit.

### a.  In-Camera Hearing

During the preliminary hearing, Deputy Teso testified that Petitioner and his co-defendant were in good standing with the Norteño gang because they had not been assaulted by the gang

1  and their names appeared on the active gang roster.  (CT 587-92.)  When questioned by

2  Petitioner's counsel whether he was concerned that they could still be attacked, Deputy Teso

3  stated he was not, because a confidential informant had informed him that they would not be

4  harmed.  (CT 599.)  Counsel for Petitioner and co-defendant demanded the name of the

5  informant, but the prosecutor stated the identity was privileged according to California Evidence

6  Code § 1041.  (CT 599-600.)  Whereupon the court held an in-camera hearing.  (CT 606-07.)

7  The hearing was transcribed and filed under seal with the Fifth DCA.  (See Fifth DCA Docket of

8  Case No. F062970.)  At the conclusion of the hearing, the trial court stated:

> All right, I held an in camera hearing, and I'm going to make a finding based on
> the testimony I heard that disclosure of the identity of this informer would present
> a distinct danger to the informer and his family.  [¶]  I'm also going to make the
> finding that nondisclosure in no way deprives either defendant of a fair trial.

12  (CT 608.)

13          *i.    Federal Standard*

14       In Roviaro v. United States, 353 U.S. 53, 59 (1957), the Supreme Court held that the

15  government has a privilege of withholding an informer's identity.  "The purpose of the privilege

16  is the furtherance and protection of the public interest in effective law enforcement."  Id.

17  However, "the privilege must give way" when "the disclosure of an informer's identity, or of the

18  contents of his communication, is relevant and helpful to the defense of an accused, or is essential

19  to a fair determination of a cause."  Id. at 60-61.  The "public interest in protecting the flow of

20  information" must be balanced against "the individual's right to prepare his defense."  Id. at 62.

21  The balancing test depends "on the particular circumstances of each case, taking into

22  consideration the crime charged, the possible defenses, the possible significance of the informer's

23  testimony, and other relevant factors."  Id.

24          *ii.    Analysis*

25       Petitioner has not shown the state court rejection of his claim to be contrary to or an

26  unreasonable application of the above standard.  The state court conducted a hearing and balanced

27  the factors identified above; therefore, the state court's determination could not be contrary to

28  Roviaro.  In addition, the court made a finding that revealing the identity of the informant would

1   endanger him and his family.  There is nothing in the record to contradict this finding, and it was

2   supported by the deputy's statement confirming the danger.  On the other hand, the court

3   determined that defendants would not be denied a fair trial, because the information provided by

4   the informant only confirmed the information provided by the gang roster, which was the

5   "primary source" for the deputy's opinion.  (CT 608-09.)  In light of this, the defense had

6   sufficient information to challenge the deputy's opinion without the identity of the informant.

7   Accordingly, the state court rejection of the claim was not unreasonable.

8                    *b.   Victim's Jacket*

9           Petitioner alleges that the victim's jacket was withheld by the prosecution.  He claims the

10  jacket should have been produced so a ballistics examination could be conducted to determine if

11  there was gun powder residue or oil present.

12          This claim is without merit, because the jacket was received by Gonzales, not the

13  prosecution, and she turned it over to the victim's mother.  (RT 323-24, 376.)  Since the

14  prosecution was not in possession of the item, there was no <u>Brady</u> violation.  In addition,

15  Petitioner's contention that the jacket could have been tested for gun powder or oil residue is

16  contradicted by his own testimony.  As pointed out by Respondent, Petitioner himself testified

17  that he saw the victim take off the jacket before entering the back yard.  (RT 1682, 1684-86.)  In

18  his petition, he states that the victim took the jacket off and placed it on the fence before entering

19  the backyard where the alleged struggle ensued.  (Pet. at 45.)  Since the victim was not wearing

20  the jacket at the time he was shot, there is little relevance as to whether the jacket had gun powder

21  residue on it.  Even if gunshot residue had been found on it, this could only have supported the

22  conclusion that the jacket had been in an environment where a gun was fired.  None of these

23  conclusions would have supported Petitioner's defense.

24                    *c.   Shoebox*

25          Petitioner also contends that the shoebox which had been seized from Tapia's bedroom

26  was withheld or destroyed by the prosecution in violation of <u>Brady</u>.  Petitioner argues that testing

27  of the box would have revealed traces of marijuana, and therefore would have supported the

28  defense theory that Tapia was transporting marijuana and not a gun.

1    Respondent is correct that the claim is speculative.  There is no indication that the box was

2    withheld from the defense or that testing would have revealed the presence of marijuana.  The

3    shoebox had been mentioned at trial but neither defense counsel objected that the item had been

4    withheld from them or that they wanted it tested.  Moreover, even if testing had revealed the

5    presence of marijuana in the shoebox, it would not have assisted the defense in such a manner as

6    to undermine confidence in the verdict.  The fact that marijuana had been present in the box at

7    some point would not have eliminated the possibility that the box had been used to transport the

8    weapon.

9              *d.   Payments to Witness Eloiza Gonzales*

10   Petitioner claims the prosecution withheld evidence that it had paid witness Eloisa

11   Gonzales for her testimony.  This claim is also unsupported by any evidence in the record.  There

12   is no indication that Gonzales had been paid for her testimony.  Rather, the record reflects that

13   Gonzales was motivated to testify because of her friendship with the victim, and she testified to

14   this fact at trial.  (RT 162-63, 221-22.)  There is no showing of a Brady violation.

15              *e.   Letter to Tapia*

16   Last, Petitioner contends that the prosecution sent Tapia a threatening letter, advising him

17   that if he didn't testify at trial consistent with his statements to detectives, he would be

18   prosecuted.

19   Prior to trial, Tapia entered into an agreement with the prosecution that in exchange for

20   his truthful testimony, the prosecution would not file charges against him with regard to the

21   victim's death.  (RT 563-65.)  The prosecution sent a letter to Tapia's counsel explaining that

22   Tapia's statements to detectives could be used to prosecute Tapia for the victim's death.  (RT

23   564.)  In the letter, the prosecutor offered to drop charges if Tapia testified "fully, fairly, and

24   truthfully" at hearings and trials in the matter.  (RT 564.)  The letter was entered into evidence as

25   an exhibit.  (RT 563-64.)  There is no indication in the record that anything concerning the letter

26   or the agreement was not disclosed to the defense.  In addition, there is nothing improper about a

27   letter confirming such a plea agreement offer.

28   ///

42

1

       *f.   Conclusion*

2

       Given the foregoing, Petitioner fails to show that any evidence was withheld, destroyed or

3

suppressed by the prosecution.  The claim should be rejected.

4

       *5.   Claim Five – Juror Misconduct*

5

       In his next claim for relief, Petitioner contends that comments from prospective jurors

6

Joann Marks and Julie Johnson during voir dire violated his constitutional rights to a fair trial.

7

This claim was presented in a habeas petition to the California Supreme Court where it was

8

summarily denied.

9

       *a.   Background*

10

       Prospective juror Joann Marks informed the court on the second day of voir dire that she

11

had an issue to bring to the court's attention.  (RT 181.)  The following exchange then took place:

12

13

> THE COURT: All right.  Before I start addressing the new six of you, Ms. Marks, Juror Number 7, you advised my bailiff that you wish to address the court.  Is this something you want to do in open court or in chambers?

14

> MS. MARKS: It doesn't matter.

15

> THE COURT: Go ahead.

16

17

> MS. MARKS: After being released yesterday and spending the evening home thinking about everything that is taking place - - well, first, I don't feel well from the stress.  I've got some GI issues.

18

19

> And thinking of the commitment question that the DA presented and asked if it happened to go longer, it would be even worse.

20

> I became frustrated and I stated for the fact that I have to alter what's going on for some potential gang members who don't care about the rest of us - -

21

22

> THE COURT: Ma'am, that's enough.  You are excused.  Report back to the jury commissioner's office.  We'll just leave the six there for the time being.

(RT 181-82; Pet. Ex. D.)

23

24

       During voir dire, prospective juror Julie Johnson revealed that she considered Deputy

District Attorney Marlisa Ferreira a good friend and that she knew District Attorney Birgit

25

Fladager.  (RT 161-62, 174.)  She further stated she had attended a fundraiser for Fladager.  (RT

26

176-77.)  She also stated she had met "a couple other police officers."  (RT 162.)  Petitioner's

27

counsel exercised a peremptory challenge and Ms. Johnson was excused.  (RT 179-80.)

28

1

2    *b.   Federal Standard*

3        The Sixth Amendment right to trial by jury "guarantees to the criminally accused a fair

4    trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "[A]

5    petitioner is entitled to habeas relief only if it can be established that the constitutional error had

6    'substantial and injurious effect or influence in determining the jury's verdict.'"  Lawson v. Borg,

7    60 F.3d 608, 612 (9th Cir.1995) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 & n. 9

8    (1993)).  However, there is no requirement that a defendant be given a new trial each time a juror

9    has been placed in a situation that could potentially be compromising.  Smith v. Phillips, 455 U.S.

10   209, 217 (1982).  "Due process means a jury capable and willing to decide the case solely on the

11   evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to

12   determine the effect of such occurrences when they happen."  Id.

13       *c.   Analysis*

14       In this case, the two prospective jurors in question did not serve on the panel.  In such a

15   case, relief is available only if a juror who actually served was biased.  Ross v. Oklahoma, 487

16   U.S. 81, 86 (1988).  Here, there is no evidence in the record that any juror was biased, or that the

17   prospective jurors' comments had any effect on the venire.  Jurors are presumed to be impartial,

     and there is no evidence here otherwise.

18       Regardless, the remarks by the prospective jurors could have had no effect.  Ms. Marks

19   stated her potential bias against gang members, but this is entirely commonplace during voir dire

20   and is precisely the purpose of voir dire.  Likewise as to Ms. Johnson, it is not unusual for a juror

21   to know or have some familiarity with a party in the case.  Ms. Johnson expressed no bias, and in

22   any event, she was excused.  There is no question that the two prospective jurors' remarks had no

23   effect on the jury.  The claim should be rejected.

24       *6.   Claim Six – Failure to Exclude Witness Testimony*

25       Petitioner next claims that the trial court erred by failing to exclude the allegedly coerced

26   trial testimony of prosecution witness Jorge Tapia.

27       Petitioner raised this claim on direct review, and the Fifth DCA provided the last reasoned

28   decision, as follows:

Defendants say Tapia's trial testimony was coerced, and was the product of a coerced police statement. As a result, they claim, its admission violated their due process right to a fair trial. We conclude the testimony was properly admitted.

*1. Background*

Tapia's trial testimony is summarized in the statement of facts, *ante*. Before he testified, Gutierrez requested an Evidence Code section 402 hearing concerning the voluntariness of Tapia's pretrial statement and trial testimony. [N.17]

> [N.17] In addition to arguing the claim fails on the merits, the Attorney General says Saldana forfeited his claim because the record does not show he objected or joined in Gutierrez's objections to Tapia's testimony. We recognize that "[a] claim of coercion is not cognizable on appeal in the absence of an objection to the testimony at trial" (*People v. Kennedy* (2005) 36 Cal.4th 595, 612, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459), and failure to join in the objection of a codefendant generally constitutes a forfeiture of the issue on appeal (*People v. Wilson* (2008) 44 Cal.4th 758, 793). However, "[i]n requiring an objection at trial, the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error. [Citation.]" (*People v. Kennedy, supra*, 36 Cal.4th at p. 612.) Here, the record shows that, although counsel for Gutierrez took the lead in presenting the issue, the trial court and prosecutor treated the objection as having been made by both defendants. Under these circumstances, we find no forfeiture.

At the Evidence Code section 402 hearing, Tapia was represented by Attorney John Hillenbrand. On direct examination by the prosecutor, Tapia testified that Hillenbrand also represented him at the time of the preliminary hearing. At the preliminary hearing, Tapia invoked his Fifth Amendment rights. At that time, however, he did not have any agreement with the prosecution. After the preliminary hearing, the prosecutor entered into a written agreement with Tapia, whereby Tapia would not be prosecuted for any of the events leading up to the murder of Villanueva, including providing the firearm to Gutierrez, and anything that occurred at the Angelus Street address. Tapia signed the agreement, after consultation with his attorney, because he believed it was the right thing to do.

Tapia testified that he recalled some of the interview he had on June 11, 2008, with Bertram and Bunch. He was not shackled or handcuffed, no weapon was pointed at him, and he gave the statement of his own free will. Tapia did not recall Bertram saying he could leave any time he wanted and they would give him a ride back home, although that was reflected in the transcript. Tapia "believe[d]" he told Bertram what he knew about the events of May 25, 2008, although at the time, he had not been promised immunity. To the best of his ability, he provided a truthful statement to the officers. Asked if he was testifying of his own free will, Tapia responded, "I'm doing this because I guess I have to."

On cross-examination, Tapia testified that in June 2008, the police left a card on his door. He called them back. He was subsequently taken down to the police department. Prior to that, he had not told his mother anything about the shooting. He recalled Bertram mentioning that he knew her, but did not recall him saying several times during the interview that he was going to have a talk with Tapia's mother.

45

Tapia did not recall Bertram or Bunch telling him that he was lying, that he was at a crossroads, or that his future was at issue. He acknowledged, however, that the transcript of the interview reflected Bunch saying, "You want to do the right thing. It's okay. It's very important. This day is your day. Right now. This second. You are standing right now at a crossroads," and "So it's very important for your future."[N.18] The transcript also showed Bertram saying, "We talked to your mom before we came over here, but I don't think you are being honest with us. As a matter of fact, I know you're not. Because I know that within a half hour of the shooting you were on the phone with Ray." However, Tapia did not recall being told it was his future, he was at a crossroads, or to do the right thing.

> [N.18] Unlike the parties at trial, we do not have the transcript before us. It appears the court reporter used quotation marks when one of the attorneys was reading directly from the transcript. Where quotation marks are not used, we have no way of knowing whether the words accurately represent the transcript's contents.

Tapia first denied that talking to the officers was frightening. He did not know if he was going to be charged for having some involvement in the case. The transcript showed Bunch saying, "This is a crossroads for you. It seriously is. I can't stress that enough. It's a crossroad." Bertram then said, "We're right on the cusp of arresting them. Okay? And a lot of people are going to get caught up in this, and a lot of people are going to go down for their involvement." Bunch followed with, "He's not—it's no threat. It's a sure thing," whereupon Bertram said, "And I really don't think you want to go down for being involved with this at all." Tapia acknowledged the foregoing was shown in the transcript, but denied that when he was told that, he understood he could be charged in a possible murder case. The officers were just asking him questions about where he was "and stuff," and he was answering them truthfully. With respect to whether the officers kept telling Tapia that he was not being truthful, the officers were speaking very fast and Tapia could not hear everything, which was why, he thought, they said it so many times. He did not remember the officers telling him what they wanted him to say, or arguing with them that something was not as he remembered.

Tapia later admitted it had scared him to have the officers say he was involved in murder. He did not do anything, so "of course" he did not want to be charged with anything to do with the murder. He did not think that he could be charged if he did not talk to them, because he did not do anything.

Tapia invoked his constitutional right not to testify at the preliminary hearing not because he was afraid of testifying, but because he thought requiring a lawyer would be better for him. He did not understand a lot of what was going on, which was why he got a lawyer. The fact he was now testifying did not have anything to do with any sort of promise the government made to him, although he did read and understand the letter from the prosecutor to his lawyer. [N.19]

> [N.19] The immunity agreement was contained in a letter from the prosecutor to Tapia's attorney.

Tapia understood the letter said his statement could result in him being prosecuted for crimes associated with Villanueva's murder. His understanding was, however, that he could only be prosecuted for such crimes if he did not say the truth. Tapia acknowledged the letter said, "Your client has represented that the statements [sic] he gave is true regarding the event and circumstances surrounding the shooting death of Roger Villanueva on May 25th, 2008." Asked if he understood the truth

46

was supposed to be the same as the statement he gave to the officers in June 2008, Tapia replied that his understanding was, if he testified truthfully to what he remembered, he would be granted immunity. Asked if he came to court to voluntarily give a statement without any order that he do so, Tapia responded, "I just listened to my lawyer, I guess." Apart from what his lawyer told him, he was not given any order or subpoena to be present. He believed, however, that he did have to testify.

At the conclusion of the hearing, the trial court found no evidence of coercion, either with respect to Tapia's statement to Bertram and Bunch or his trial testimony. Accordingly, the court ruled Tapia would be allowed to testify before the jury.

   *2. Analysis*

In *People v. Williams, supra*, 49 Cal.4th 405, the California Supreme Court stated:

> "Defendants have limited standing to challenge the trial testimony of a witness on the ground that an earlier out-of-court statement made by the witness was the product of police coercion.... A defendant may assert a violation of his or her own right to due process of the law and a fair trial based upon third party witness coercion ... if the defendant can establish that trial evidence was coerced or rendered unreliable by prior coercion and that the admission of this evidence would deprive the defendant of a fair trial. [Citations.] Although the out-of-court statement itself may be subject to exclusion because coercion rendered it unreliable, it is more difficult for a defendant to establish that the court should exclude the witness's trial testimony. As [the court] explained [in *People v. Badgett* (1995) 10 Cal.4th 330, 348], '[t]estimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony.' [Citation.] The burden rests upon the defendant to demonstrate how the earlier coercion 'directly impaired the free and voluntary nature of the anticipated testimony in the trial itself' [citation] and impaired the reliability of the trial testimony [citation]." (*People v. Williams, supra*, at pp. 452–453, fn. omitted.)

"On appeal, we independently review the entire record to determine whether a witness's testimony was coerced, so as to render the defendant's trial unfair. [Citation.] In doing so, however, we defer to the trial court's credibility determinations, and to its findings of physical and chronological fact, insofar as they are supported by substantial evidence." (*People v. Boyer* (2006) 38 Cal.4th 412, 444.)

As an initial matter, we are not convinced Tapia's statement to Bertram and Bunch was coerced. Cases involving the admissibility of a defendant's own statement are instructive. In that regard, the California Supreme Court stated: "The business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means. '[A]lthough adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and the gathering of proof.' [Citation.] 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 297–298.) "'"[M]ere advice or exhortation by the police that it would be better for

the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." [Citation.] In terms of assessing inducements assertedly offered to a suspect, "'[when] the benefit pointed out by the police ... is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.]" [Citation.]'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 357–358.) "'[M]ere questions, or exhortations to tell the truth or clear [one's] conscience or help [one]self by revealing facts as to the dominant part of [a codefendant] or some other person in the criminal enterprise'" are insufficient: " '[I]ntellectual persuasion is not the equivalent of coercion.' [Citation.]" (*People v. Hill* (1967) 66 Cal.2d 536, 548–549; see also *People v. Jones, supra*, 17 Cal.4th at p. 298 [detective's telling defendant his answers could affect the rest of defendant's life did not establish coercion].)

Defendants' protestations notwithstanding, the record before us fails to show Tapia was frightened or otherwise coerced "into making a statement that was both involuntary and unreliable." (*People v. Jones, supra*, 17 Cal.4th at p. 298.) [N.20] That it may have scared him to have the officers say they thought he had something to do with a murder simply does not establish coercion.

> [N.20] Defendants suggested at trial, but never actually established through the transcript of the interview or testimony, that Bertram and Bunch told Tapia what they wanted him to say.

More importantly, even assuming an element of coercion was present in the interview, reversal is not required. Defendants have failed to demonstrate Tapia's trial testimony was coerced or rendered unreliable by any such prior coercion, or that admission of his testimony deprived them of a fair trial.

Almost three years had elapsed between the time of the interview (June 2008) and Tapia's appearance at trial (March 2011). Such passage of time serves at least partially to dissipate the coercive effect of an interrogation, especially when, as here, the witness has received immunity under an agreement that is not conditioned upon the consistency of trial testimony with an earlier statement, and the witness is represented by independent counsel. (See *People v. Williams, supra*, 49 Cal.4th at pp. 454–455.)

The immunity agreement required Tapia to testify "fully, fairly, and truthfully," not consistently with his statement to Bertram and Bunch. Under the agreement, whether Tapia's testimony was truthful would be determined by the trial judge, not the prosecutor. Whether the immunity agreement remained in effect did not depend on whether defendants were convicted.

The California Supreme Court has made it clear that "[t]here is nothing improperly coercive about confronting a lesser participant in a crime with his or her predicament, and offering immunity from prosecution for the witness's criminal role in return for the witness's promise to testify fully and fairly. [Citations.]" (*People v. Boyer, supra*, 38 Cal.4th at p. 445.) "A prosecutor may grant immunity from prosecution to a witness on condition that he or she testify truthfully to the facts involved. [Citation.] But if the immunity agreement places the witness under a strong compulsion to testify in a particular fashion, the testimony is tainted by the witness's self-interest, and thus inadmissible. [Citation.] Such a 'strong compulsion' may be created by a condition "'that the witness not materially or substantially change [his or] her testimony from [his or] her tape-recorded statement already given to ... law enforcement officers."' [Citation.] [¶] On the

other hand, [the high court has] upheld the admission of testimony subject to grants of immunity which simply suggested the prosecution believed the prior statement to be the truth, and where the witness understood that his or her sole obligation was to testify fully and fairly." (*Id.* at p. 455; see also *People v. Williams, supra*, 49 Cal.4th at p. 455; *People v. Badgett, supra*, 10 Cal.4th at pp. 354–355.) This is so even when the witness is legally deemed an accomplice. (*People v. Avila* (2006) 38 Cal.4th 491, 594; see § 1111.) [N.21]

> [N.21] The trial court here instructed jurors that if they determined murder was committed, then Tapia was an accomplice to that crime.

The immunity agreement here did not place Tapia under a "strong compulsion" to testify in any particular fashion. Although he was aware that if he did not testify, he could be charged in this case—something he did not wish to happen—this does not amount to coercion such that his testimony should have been excluded. (See *People v. Boyer, supra*, 38 Cal.4th at p. 445 [no improper coercion found despite witness's making clear her primary reason for cooperating at trial was prosecution's offer of immunity from prosecution as accessory to murder in return for truthful testimony].) "All immunized witnesses are offered some quid pro quo, usually an offer of leniency. [The California Supreme Court has] never held, nor has any authority been offered in support of the proposition, that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced." (*People v. Badgett, supra*, 10 Cal.4th at p. 354.)

Tapia clearly understood he was required to testify truthfully, not in a specific manner, his professed lack of memory concerning what was said during the interview notwithstanding. [N.22] Indeed, he did *not* testify in conformity with his statement to investigators concerning the key subject of the gun. "Thus defendants fail in the essential task of connecting the pressures brought to bear on the witness before trial with [his] ultimate trial testimony." (*People v. Badgett, supra*, 10 Cal.4th at p. 355.) [N.23]

> [N.22] The following exchanges occurred during Tapia's cross-examination by counsel for Gutierrez: "Q. As you sit here and testify, do you understand that you could be prosecuted for crimes associated with the supposed murder of Roger Villanueva? [¶] A. If I'm not truthful, yes, I could be prosecuted. [¶] Q. Well, if you are not truthful today or whether you are not truthful in June of 2008? [¶] A. Based on being truthful of what I remember today. [¶] Q. What you remember today; right? [¶] A. Correct." "[Q.] Then—then the next part [of the prosecutor's letter to Tapia's attorney], I want to draw your attention is—is that, if the above-stated conditions are not met or it is found that you have testified falsely or refused to testify, then the District Attorney is not bound by this agreement, and you will be—you can be prosecuted for aiding and abetting the murder of Roger Villanueva, additionally prosecuted for perjury, if applicable. Did you read and understand that? [¶] A. Yes. [¶] Q. All right. So you understood that if you either testified falsely or if you even refused to testify, you are going to be charged in the murder of Roger Villanueva; isn't that true? [¶] A. Correct. [¶] Q. And you don't want to be charged that way, do you? [¶] A. I believe nobody wants to be charged."

> [N.23] We note that, although defendants did not succeed in having Tapia's trial testimony excluded, they fully cross-examined the parties to the interview (and, in the case of Bertram and Bunch, called them as defense

1              witnesses and examined them further concerning the interview), thereby

2              availing themselves of "the most powerful means in [their] arsenal for
challenging the reliability of the witness's statements." (*People v. Williams,*

3              *supra,* 49 Cal.4th at p. 455.)

4          <u>Gutierrez</u>, 2013 WL 4523566, at *14–18.

5              Under the AEDPA, Petitioner is not entitled to federal habeas relief on this claim.

6    Although the United States Supreme Court has held that a defendant's coerced confession cannot

7    be used at trial, <u>see</u> <u>Jackson v. Denno</u>, 378 U.S. 368, 385-86 (1964), "[n]o Supreme Court case

8    addresses the issue of whether coerced witness testimony can be used against a defendant at

9    trial." <u>Trammell v. Ducart</u>, 2015 WL 4496338, at *10 (E.D. Cal. July 23, 2015) (federal habeas

10   relief for coerced witness statement unavailable under AEDPA standard of review); <u>see also</u>

11   <u>Samuel v. Frank</u>, 525 F.3d 566, 569 (7th Cir. 2008) (United States Supreme Court "has not

12   decided whether the admission of a coerced third-party statement is unconstitutional"); <u>Harris v.</u>

13   <u>Soto</u>, 2016 WL 2587373, at *8-9 (C.D. Cal. Mar. 25, 2016), *adopted*, 2016 WL 2347825 (C.D.

14   Cal. May 3, 2016) (same).  In the absence of controlling Supreme Court law, Petitioner cannot

15   obtain federal habeas relief.  <u>See</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006) ("Given the lack of

16   holdings from this Court [on issue presented], it cannot be said that the state court

17   "unreasonabl[y] applied clearly established Federal law.") (internal brackets and citation

18   omitted).

19            Even assuming Tapia's testimony was erroneously admitted, such admission would not

20   constitute a due process violation entitling Petitioner to habeas relief.  In <u>Holley v. Yarborough</u>,

21   the Ninth Circuit concluded that a petitioner was not entitled to habeas relief because the Supreme

22   Court has not made "a clear ruling that admission of irrelevant or overtly prejudicial evidence

23   constitutes a due process violation sufficient to warrant issuance of the writ."  568 F.3d 1091,

24   1101 (9th Cir. 2009).

25            Furthermore, it is clear that the state court determination that Tapia's testimony was not

26   coerced was reasonable.  There is no indication in the record that Tapia was coerced, and in fact,

27   the record shows otherwise.  First, Tapia initiated contact with investigators.  (RT 546, 583.)

28   Tapia then went to the police station on his own accord.  (RT 1553-54.)  At trial, Tapia testified

1    that he provided a statement voluntarily, and that he was never threatened.  (RT 543, 609.)  In

2    addition, Tapia was thoroughly cross-examined by defense counsel concerning possible coercion.

3    (RT 600-39, 644-50, 654, 656-59, 671-76, 680-82.)

4         In any case, the police interview with Tapia was not admitted, and there is no evidence

5    that there was any coercion regarding Tapia's trial testimony.  Nearly three years had passed from

6    the time he was interviewed by police investigators.  (RT437.)  This was ample time in which

7    Tapia would have been away from the influence of detectives.  In addition, Tapia obtained

8    counsel who accompanied him to trial and assured that Tapia was not coerced.  Finally, Tapia did

9    not testify entirely consistently with his interview.  This further demonstrates that Tapia's

10   statements were not coerced.

11        Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or

12   an unreasonable application of, Supreme Court precedent.  The claim should be denied.

13             *7.  Claims Seven and Eight – Gang Expert Testimony*

14        Petitioner alleges that his Sixth Amendment right to confrontation and his due process

15   right to a fair trial were violated when the trial court allowed the gang expert to testify to his prior

16   bad acts.  In his subsequent claim, Petitioner alleges the gang expert's testimony constituted

17   unreliable hearsay that was more prejudicial than probative in violation of his due process right to

18   a fair trial.

19             *a.  State Court Decision*

20        In the last reasoned decision by the state courts, the Fifth DCA analyzed the claims

21   together and rejected them as follows:

22        Defendants claim their Sixth Amendment right to confrontation, and their federal
         and state due process rights to a fair trial, were violated by admission of the gang
23       expert's testimony concerning their prior bad acts. They say the hearsay relied on
         by the expert as a basis for his opinion they were members of a criminal street
24       gang was testimonial within the meaning of *Crawford v. Washington* (2004) 541
         U.S. 36 (*Crawford* ) and was offered for the truth of the matters contained therein,
25       yet they had no opportunity to confront the declarants. They further contend the
         prior-bad-acts hearsay should have been excluded because it was unreliable and
26       more prejudicial than probative. The Attorney General argues the testimony did
         not violate *Crawford*, and says the remaining challenges to the evidence were
27       forfeited by defendants' failure to object on the same grounds in the trial court. We
         conclude any error was harmless.

28

                                             51

*1. Background*

Gutierrez moved, in limine, to preclude expert gang testimony based on police reports, field identification reports, jail records, and the like, on the ground such testimony would violate his Sixth Amendment right of confrontation under *Crawford* and its progeny. He asserted the erroneous admission of such evidence would prejudice his right to a fair trial, as gang evidence has an inherent prejudice and creates a risk the jury will infer defendant has a criminal disposition and is, therefore, guilty of the alleged offense. Saldana joined in the motion.

After argument, during which the prosecutor asserted the type of evidence defendants were challenging was prejudicial but also extremely probative, the trial court observed that even if it were to rule as a general matter that the gang expert could rely on hearsay information as the basis for his opinions, that hearsay had to be reliable. The court surmised that before the gang expert was allowed to testify, "it may be ... that we're going to conduct a further hearing as to the basis of his opinions, and the Court may have to rule that some, none, or all of the things ... upon which he bases his opinion aren't reliable. [¶] ... [¶] ... I don't know that." After additional argument, the following took place:

"THE COURT: ... I think, in general, the case that I cited [*People v. Ramirez* (2007) 153 Cal.App.4th 1422], plus the case cited in that, the *Thomas* case [*People v. Thomas* (2005) 130 Cal.App.4th 1202], at least gives me, as the trial Court, the very clear impression ... that *Crawford* does not prohibit an expert from relying on certain hearsay evidence.

"It's still the rule that it has to be reliable hearsay evidence. And it is still the rule that the expert's testimony must be based, at least in part, on his or her own personal knowledge. [¶] ... [¶] Unfortunately, this motion is just painted with a very broad brush. It says they can't do this under *Crawford*. Well, there are certain things that can be done under *Crawford*. There are certain things that can't be, whether it is under *Crawford* or general rulings of evidence as to the admissibility of hearsay in general, and hearsay as relied upon by an expert.

"*I cannot make a blanket ruling on this issue. And, unfortunately, it is going to have to be handled on a piecemeal basis as each type of evidence is being introduced or attempted to be introduced.*

"So all I'm saying at this point is, I'm not going to make a ruling that *Crawford* prohibits an expert from testifying as to certain hearsay. *But there are still requirements that the People have to meet before that hearsay can be relied upon and testified to.* [¶] ... [¶] ... *So at this point*, ... *all I'm saying is that I'm not going to make a blanket ruling* that *Crawford* prohibits the use of hearsay. It does in certain circumstances. It does not in other circumstances. So we're just going to have to take it one by one and go from there." (Italics added.)

As previously described, Investigator Mariscal of the district attorney's office testified as an expert on gangs. He explained that in preparation for his testimony in a trial like this, he reads the case and then conducts an investigation into the defendants. He pulls all police reports in which they have been listed or contacted, field interview cards from different police departments, probation records, and school records if he finds them. His purpose is to conduct a thorough investigation of the individuals, their backgrounds, and their gang involvement, if any. He did

not automatically conclude something was a gang crime simply because gang members were involved.

In his written gang workup, Mariscal listed a total of 13 incidents under the heading, "Activity for Ray Gutierrez." The information formed part of the basis of his opinion in the case, both as to gang membership and gang benefit. The incidents and sources of information to which Mariscal testified, were:

(1) Turlock Police Department No. 99–0773: On January 30, 1999, Turlock police officers responded to a hardware store in Turlock regarding a shooting. Four individuals had been shot at by the passenger of a vehicle. Gutierrez was identified as the shooter. A search of his residence revealed a stolen .25–caliber handgun.

(2) Turlock Police Department No. 01–683: On January 23, 2001, a Turlock police officer responded to the area of Spruce and Angelus in Turlock in response to a report of a reckless driver. When the vehicle was stopped, the front passenger fled on foot. Gutierrez was one of the rear passengers. A stolen .22–caliber handgun was found underneath the right front passenger seat, and marijuana, a glass methamphetamine pipe, and a knife were found in the backseat.

(3) Turlock Police Department No. 01–2814: On March 31, 2001, Turlock police officers responded to a bar regarding a large crowd gathering in the parking lot. Shots were fired, and a security guard pointed out a black Cadillac as being responsible for the shooting. A witness identified Gutierrez as the passenger in the car and the person responsible for shooting four times into the air. The witness said Gutierrez and the car's driver had gotten into a fight with some other males at the bar. Another witness heard Hispanic males claiming West Side.

(4) Stanislaus County Auto Theft Task Force (StanCATT) Nos. 01–6427 and 01–6744: On August 2, 2001, task force agents stopped a stolen vehicle at Angelus and Spruce. Gutierrez was the front passenger. A methamphetamine pipe with a useable amount of methamphetamine was located on the front passenger side floorboard, where Gutierrez was sitting.

(5) Turlock Police Department No. 04–3475: On April 4, 2004, a Turlock police officer responded to a medical center in Turlock regarding a shooting victim. There, he contacted Gutierrez, who reported he had been approached by four males, one of whom pointed a gun at his face. Gutierrez reached up and grabbed the gun, which discharged into his left hand. Gutierrez told the officer he had claimed West Side Turlock Norteño for six years, but no longer claimed it.

(6) Turlock Police Department No. 04–9570: On September 21, 2004, Gutierrez was involved in a fight in Turlock in which the victim was injured. Gutierrez fled, but later turned himself in. He stated he used to be involved in gangs, but had not been for the last seven years.

(7) StanCATT report listed under CHP No. F–19–465–08: On January 9, 2008, task force officers located a stolen vehicle in an apartment complex. They observed Gutierrez drive up. One of his passengers drove the stolen vehicle away, followed by the car Gutierrez was driving. Both vehicles were stopped and the occupants arrested. While being booked into jail,

Gutierrez and one of his passengers admitted being Norteños. Another passenger was wearing a red belt.

(8) Modesto Police Department No. 07–73364: On August 3, 2007, Gutierrez was in a vehicle driven by a Norteño gang member. Also present in the car, which had the personalized license plate "Turloco," were Saldana and two other males.

(9) Turlock Police Department No. 07–11403: On November 21, 2007, officers responded to the area of Vermont and Spruce Streets, because Mylo Lopez reported the driver of a gold Chrysler Concord had pointed a gun at him. Officers located the vehicle, which was driven by Gutierrez, but did not find a handgun when they searched the car and then could not locate Lopez. Gutierrez was arrested for driving on a suspended driver's license.

(10) Turlock Police Department No. 08–2844: On March 23, 2008, an officer was dispatched to Vermont Street in response to an anonymous report of two subjects, whom the reporting party said were "June Bug" and Raymond, firing a weapon from a moving burgundy Mustang. Officers conducted a high-risk stop on the vehicle; Gutierrez was the driver, and the passenger was Joseph Gonzales, also known as June Bug. No weapon was found in the vehicle, but Gutierrez was arrested for driving on a suspended license. Gonzales, a documented Norteño, was arrested for a parole violation.

(11) Turlock Police Department No. 08–4312: On May 5, 2008, an officer was dispatched to a call of a suspicious vehicle. Gutierrez was found in the same white Nissan Altima as was involved in the present case. A search of the vehicle revealed 390 pseudoephedrine pills. Gutierrez was arrested for two warrants and possession of the pills.

(12) Turlock Police Department No. 08–4975: The current offense.

(13) Booking information from June 12, 2008: When booked into the county jail, Gutierrez claimed South as his enemies in jail who might harm him. He also responded yes and said Norte when asked if he affiliated with a gang.

As described in the statement of facts, *ante*, Mariscal opined that, on the date Villanueva was shot, Gutierrez was a Norteño gang member.

Mariscal based this opinion on everything he reviewed involving Gutierrez.
Prior to Mariscal testifying specifically as to Saldana, Saldana requested, and was granted, a continuing objection on confrontation clause grounds. [N.24] The trial court cautioned: "I don't want you to be misled that that means any other objections that stated don't need to be stated."

[N.24] The reporter's transcript reflects counsel for Saldana asked for a "consultation clause" objection. When Mariscal began to testify concerning his review of Saldana's activities, however, counsel again objected to the line of questioning as a violation of the confrontation clause, and the trial court confirmed Saldana had a continuing objection—overruled for the reasons stated pretrial—on that ground.

54

Mariscal testified that his investigative report contained the following incidents and sources of information concerning Saldana:

(1) Turlock Police Department No. 98–9638: On November 21, 1998, when Saldana was approximately 14 years old, a teacher at Turlock Junior High School caught him and another student spray-painting Norteño-related graffiti on school walls. The students were arrested for vandalism.

(2) Modesto Police Department No. 99–21601: On March 15, 1999, an officer attempted to stop a stolen vehicle in which Saldana was one of the passengers. After a pursuit, those in the car were arrested. Saldana was charged with conspiracy and auto theft. The vehicle's interior was spray painted with "14" and "X4," and "Norteño" was scratched in the dash.

(3) Turlock Police Department No. 00–96: On January 4, 2000, Saldana and a gang member were arrested after they were identified by the victim of an attempted residential burglary. Saldana acted as the lookout. Both were arrested for attempted burglary and conspiracy.

(5) [N.25] Merced Sheriff's Department No. 00–17441: On June 18, 2000, a deputy was dispatched to Hilmar for a report of juveniles vandalizing a residence. Upon arrival, he saw a white Ford Escort flee the area at a high rate of speed. When the vehicle was stopped, it was found to have been stolen. Saldana was the driver. One of the six passengers was Anthony Fuentes (Fuentes), whom Saldana identified in his wila as having snitched on him for carjacking. All were arrested for possession of stolen property, and Saldana was also arrested for reckless driving and driving without a license.

[N.25] For unknown reasons, no testimony was elicited concerning incident number 4.

(6) Turlock Police Department No. 00–9172: On November 7, 2000, Fuentes was stopped by police while driving a stolen vehicle and was arrested for auto theft, possession of stolen property, and driving without a license. He said Saldana had given him the car and car keys earlier that day. Saldana was then arrested for vehicle theft.

(7) Probation report by Probation Officer Delgado: On May 2, 2001, Saldana admitted his moniker was Tito and that he began associating with Norteños while in junior high. Saldana said, however, he was no longer associated.

(8) Modesto Police Department No. 02–46694: On April 26, 2002, an officer stopped a vehicle driven by Michael Perez. Saldana and Fuentes were passengers. Both were arrested for warrants.

(9) Notation by Probation Officer Garcia: On May 29, 2002, Saldana said the four dots on his hand indicated being a Northerner. He admitted associating with Norteños.

(10) Turlock Police Department No. 02–10424: On October 29, 2002, officers were dispatched to a shots-fired call in the 700 block of Angelus Street. The victim reported that her nephew, Saldana, had shot at her, after she got into an argument with Saldana and Fuentes. Another witness saw Saldana with an arm extended, pointing toward the area of the victim, then

he heard a gunshot. Saldana was arrested for assault with a firearm. A latex balloon containing ten .22–caliber bullets was found on his person.

(11) Juvenile hall intake assessment by Probation Officer Childers: On October 30, 2002, Saldana admitted being involved in the Norteño gang, but denied "claiming."

(12) Probation report by Probation Officer Garcia: On April 17, 2003, Saldana admitted associating with the Norteño gang.

(13) Notation by Officer Sharkie: On June 7, 2003, Sharkie conducted a probation search of Saldana's bedroom. She found and confiscated one red hat, one red sweatshirt, and one red Heat jersey.

(14) Turlock Police Department No. 03–8782: On September 2, 2003, an officer responded to Farr Street in Turlock in response to a report of a carjacking and kidnapping. The victim reported he had stopped at an intersection when a vehicle stopped in front of him and two individuals got out. One punched the victim and knocked him out. The victim identified Saldana and Fuentes as being with this person. The victim said he was pulled from his car, thrown into its backseat, and driven to another area. This occurred because the victim had been associating with Sureños and was believed to be giving them information. Fuentes and Saldana were arrested for carjacking and kidnapping for carjacking.

(15) Turlock Police Department No. 04–7738: On August 4, 2004, police officers conducted a probation search at Saldana's residence. They located several firearms, including a sawed-off shotgun and ammunition, another modified shotgun, an illegally modified .22–caliber rifle, a nine-millimeter revolver, and handgun ammunition. Saldana admitted the firearms and ammunition were his, and said he had them to protect his residence. His tattoos were documented as "W" on his left forearm and "S" on his right forearm, which Saldana stated stood for West Side. He had the word "Turlock" tattooed on his upper back, and said he used the moniker Tito.

(16) Modesto Police Department No. 05–40681: On April 15, 2005, a Norteño gang membership roster was found on a wila in a cell at the Stanislaus County Jail that housed Norteño gang members. Saldana's name was on the roster.

(17) DA Report No. 05–DA0234: On September 6, 2005, Mariscal interviewed the victim of the earlier carjacking. The victim related he had been walking down the street when he was jumped by two individuals he identified as Saldana's cousins. They called him a rat and beat him up because he was going to testify against Saldana in the carjacking case. The victim said he had been an active Norteño gang member with Saldana, and he identified Saldana as an active member.

(18) Modesto Police Department No. 07–73364: On August 3, 2007, Saldana was the passenger in a vehicle with the license plate "Turloco." Gutierrez and three others were also in the car. Saldana said "VWS" stood for "Varrio West Side," and he stated he was a "Norteño only."

(19) Turlock Police Department No. 07–11617: On November 27, 2007, officers conducted a parole search of Saldana's residence. In his bedroom

closet, they found a loaded .38–caliber handgun. Saldana's girlfriend said the gun belonged to her, but gave conflicting statements. Saldana was arrested for being a felon in possession of a firearm. During subsequent telephone calls to his girlfriend from jail, Saldana said Gutierrez was going to take blame for the gun. When the girlfriend said she would take the blame because she had already told police the gun was hers, Saldana said he would not allow her to take the blame, and that Gutierrez would do it.

(20) The current offense. When Gutierrez's wife was interviewed, she identified both defendants as active gang members. On June 12, when booked into jail, Saldana admitted he affiliated with Norteños.

As described in the statement of facts, *ante*, Mariscal opined that, on the date Villanueva was shot, Saldana was a Norteño gang member. Mariscal based this opinion on all the reports and incidents he reviewed concerning Saldana.

### 2.  Applicable Legal Principles

"The Confrontation Clause of the Sixth Amendment [to the United States Constitution] provides: 'In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' In [*Crawford, supra*,] 541 U.S. [at pages] 53–54, [the United States Supreme Court] held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' A critical portion of this holding ... is the phrase 'testimonial statements.' Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821 (*Davis*). "Accordingly, after *Davis*, the determination of whether the admission of a hearsay statement violates a defendant's rights under the confrontation clause turns on whether the statement is testimonial. If the statement is testimonial, it must be excluded unless the declarant is unavailable as a witness and the defendant had a prior opportunity to cross-examine the declarant. If the statement is not testimonial, it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 291; see *People v. Cage* (2007) 40 Cal.4th 965, 981–982 & fn. 10, 984.)

In *Crawford*, the United States Supreme Court declined to give a precise definition of "testimonial statements," although it gave as "formulations of [the] core class of 'testimonial' statements" "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]"; and "[s]tatements taken by police officers in the course of interrogations," with the term "interrogation" being used in its colloquial, rather than any technical legal, sense. (*Crawford, supra*, 541 U.S. at pp. 51–52, 53, fn. 4.) The court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who

makes a casual remark to an acquaintance does not." (*Id*. at p. 51.)

In *Davis*, the high court declined to attempt to classify all conceivable statements—even those made in response to questioning by police—as either testimonial or nontestimonial. (*Davis, supra*, 547 U.S. at p. 822.) It did further define the categories, however, stating: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Ibid*., fn. omitted.)

From *Davis*, the California Supreme Court has derived several basic principles. "First, ..., the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage, supra*, 40 Cal.4th at p. 984, fns. omitted.) "It is the 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause. [Citation.] Consequently, if a statement is not offered for its truth, or is nontestimonial in character, the confrontation clause is not a bar to admission." (*People v. Blacksher* (2011) 52 Cal.4th 769, 813; see *Michigan v. Bryant* (2011) 562 U.S. —— [131 S.Ct. 1143, 1155].)

It is settled that, "because the culture and habits of gangs are matters which are 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' [citation], opinion testimony from a gang expert, subject to the limitations applicable to expert testimony generally, is proper. [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9.) "'An expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably ... be relied upon" for that purpose. [Citations.]'" (*People v. Carpenter* (1997) 15 Cal.4th 312, 403, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106–1107.) "And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter ... upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 (Gardeley ).)

The application of *Crawford* to such "basis evidence" is less settled. Several appellate opinions have held *Crawford* does not apply, reasoning variously that

hearsay in support of expert opinion is not the sort of testimonial hearsay the use of which *Crawford* condemned (*People v. Ramirez, supra*, 153 Cal.App.4th at p. 1427) or that hearsay relied on by experts in formulating their opinions is not testimonial because it is not offered for the truth of the fact stated (*People v. Cooper* (2007) 148 Cal.App.4th 731, 747; *People v. Thomas, supra*, 130 Cal.App.4th at p. 1210) and the expert is subject to cross-examination concerning his or her opinions (*People v. Sisneros* (2009) 174 Cal.App.4th 142, 154). In *People v. Hill* (2011) 191 Cal.App.4th 1104, by contrast, the court determined that "where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Id.* at p. 1131, fn. omitted.) Nevertheless, the court found itself bound by *Gardeley* and similar California Supreme Court precedent, and so concluded the trial court in the case before it properly determined the challenged basis evidence did not violate the hearsay rule or confrontation clause, since it was not offered for its truth but only to evaluate the expert's opinions. (*Hill, supra*, at p. 1131.)

The United States Supreme Court itself has produced fractured opinions concerning *Crawford's* application to expert testimony and the information on which such testimony is based. (See, e.g., *Williams v. Illinois* (2012) 567 U.S. —— – [132 S.Ct. 2221]; *Bullcoming v. New Mexico* (2011) 564 U.S. —— [131 S.Ct. 2705]; *Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305.) Thus far, the California Supreme Court has attempted to make sense out of these opinions in cases involving basis evidence such as autopsy and laboratory analysis reports. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 655–656, 658–659 (*Rutterschmidt*); *People v. Dungo* (2012) 55 Cal.4th 608, 612, 617–618; *People v. Lopez* (2012) 55 Cal.4th 569, 573, 579–582; see also *People v. Geier* (2007) 41 Cal.4th 555, 593–594, 596–607.) It has yet to do so, however, with respect to the basis evidence of a gang expert, whose testimony is usually based, at least in part, on his or her own experience and investigation.

Post-*Crawford*, reliability is not part of the confrontation clause inquiry. (*People v. Wilson* (2005) 36 Cal.4th 309, 343.) It remains relevant with respect to expert testimony, however: "[A]ny material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' [Citation.] [¶] So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily inadmissible can form the proper basis for an expert's opinion testimony. [Citations.]" (*Gardeley, supra*, 14 Cal.4th at p. 618.)

The California Supreme Court has cautioned that "prejudice may arise if, '"under the guise of reasons,"' the expert's detailed explanation '"[brings] before the jury incompetent hearsay evidence."' [Citations.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 918–919.) "Because an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment. [Citations.]" (*Id.* at p. 919.)

"Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.]" (*People v. Montiel, supra*, 5 Cal.4th at p. 919.) In addition, "[a] trial court ... 'has considerable discretion to control the form

in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' [Citation.] A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness ... against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' [Citation.] This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*Gardeley, supra*, 14 Cal.4th at p. 619.) Evidence Code section 352 further "authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. [Citation.]" (*People v. Montiel, supra*, 5 Cal.4th at p. 919.)

### 3. Analysis

As previously described, defendants challenge Mariscal's recitation of their prior bad acts on *Crawford*, reliability, and Evidence Code section 352 grounds. "'It is, of course, "the general rule"'—to which we find no exception here—"'that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' [Citations.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 186.) This rule applies to constitutional claims (*People v. Rudd* (1998) 63 Cal.App.4th 620, 628–629), unless "(1) it 'is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution.' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 353, italics omitted.)

The *Crawford* objection was clearly before the trial court. We will assume, for the sake of argument, that the isolated references by the court and counsel to reliability, prejudice, and probative value were sufficient to satisfy the requirement of a timely and specific objection with respect to those grounds. (Compare *People v. Waidla* (2000) 22 Cal.4th 690, 726, fn. 8 ["'bare reference'" to inability to cross-examine insufficient to preserve confrontation clause claim] with *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 343, fn. 5 [objection that "'the prejudice would outweigh the probative value'" sufficient to invoke Evid.Code, § 352].) The problem is, Gutierrez neither secured a ruling initially nor reiterated his objections when Mariscal testified before the jury. Saldana likewise did not secure a ruling initially; although he did request and obtain a continuing objection on confrontation clause grounds, he did not reiterate any of the other grounds for exclusion he now asserts.

"'[T]he absence of an adverse ruling precludes any appellate challenge.' [Citation.] In other words, when, as here, the defendant does not secure a ruling, he does not preserve the point. That is the rule. No exception is available." (*People v. Rowland* (1992) 4 Cal.4th 238, 259.) A "properly directed" in limine motion may preserve an objection for appeal, but again, "the proponent must secure an *express* ruling from the court. [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171, italics added.)

"[A] motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353,[N.26] i.e.: (1) a specific legal ground for exclusion is advanced

and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context. When such a motion is made and denied, the issue is preserved for appeal. On the other hand, if a motion *in limine* does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal." (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

> [N.26] Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

In responding to the in limine motion, the trial court here made it clear it could not make a blanket ruling on defendants' *Crawford* claim, was making no ruling on whether the basis evidence met any other requirements for being placed before the jury, and would have to consider each type of evidence as it was presented. Subsequently, it also made clear that Saldana's continuing objection under Crawford did not encompass, or excuse Saldana from making, objections on other grounds.

Under these circumstances, we conclude defendants failed to preserve some, if not all, of the issues for appeal. "Because the trial court did not rule on [their] objections *in limine*, [they] '[were] obligated to press for such a ruling and to object to [the evidence] until [they] obtained one. [They] failed to do so, thus depriving the trial court of the opportunity to correct potential error.' [Citation.]" (*People v. Ramos, supra*, 15 Cal.4th at p. 1171.)

In any event, we disagree with defendants' assertion they were prejudiced by admission of the challenged evidence. [N.27] In this regard, defendants argue that gang evidence is "powerfully prejudicial." They say there was ample evidence, apart from their prior acts, upon which Mariscal could have opined they were gang members. Accordingly, they conclude, the prosecutor brought in those bad acts to show criminal disposition and bad character, as a means of creating an inference defendants were guilty as charged based on their longstanding gang involvement. Defendants say the evidence was "designed to inflame the passions and prejudices of the jury" against them.

> [N.27] Accordingly, we need not address Saldana's undeveloped assertion that if trial counsel forfeited the issue, Saldana received ineffective assistance of counsel. Saldana chides the Attorney General for merging two issues contained in Saldana's opening brief. Saldana says this violates California Rules of Court, rule 8.204(a)(1)(B), which requires that a brief "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority...." Saldana says the Attorney General has "waived response to these arguments by failing to comply with the rules of court."

In our view, the Attorney General has fully complied with the rule. The true issue is whether the gang expert should have been permitted to testify to defendants' prior bad acts. That Saldana has chosen to place constitutional and state evidentiary grounds for his claim of error into separate issues does not mean the Attorney General was required to employ identical organization. On the other hand, we doubt Saldana's ineffective assistance of counsel claim complies with the same rule.

Generally speaking, "[t]he erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 247, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Error in the admission of nontestimonial hearsay is also assessed under the *Watson* standard (*People v. Davis* (2005) 36 Cal.4th 510, 538; *People v. Garcia, supra*, 168 Cal.App.4th at p. 292), as are error in the admission of prior crimes evidence (*People v. Williams* (2009) 170 Cal.App.4th 587, 612) and a trial court's determinations under Evidence Code section 352 (People v. Gonzales (2011) 51 Cal.4th 894, 924). *Crawford* error, on the other hand, is assessed under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) (*People v. Archer* (2000) 82 Cal.App.4th 1380, 1394; see also *People v. Harrison* (2005) 35 Cal.4th 208, 239), as are due process violations (see *People v. Mena* (2012) 54 Cal.4th 146, 159; *People v. Malone* (1988) 47 Cal.3d 1, 22). "Harmless-error review looks ... to the basis on which 'the jury *actually rested* its verdict.' [Citation.] The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

"Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' [citation], [has the United States Supreme Court] imposed a constraint tied to the Due Process Clause." (*Perry v. New Hampshire* (2012) 565 U.S. —— [132 S.Ct. 716, 723]; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 696–697 & cases cited.) "'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229, italics added.)

"California courts have long recognized the potential prejudicial effect of gang evidence. However, they have admitted such evidence when the very reason for the crime, usually murder, is gang related. [Citations.] Evidence of gang membership has also been admitted to prove bias, provided it is not cumulative to other properly admitted and less inflammatory evidence. [Citations.]

"Due to its potential prejudicial impact on a jury, our Supreme Court has condemned the introduction of 'evidence of gang membership if only tangentially relevant, given its highly inflammatory impact.' [Citation.] Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.] Such evidence is only admissible when it is logically relevant to some material issue at trial other than character trait evidence.

[Citation.]" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.)

In the present case, the evidence was logically relevant to material issues at trial other than character trait or disposition, including membership in the gang (which in turn was relevant to the gang enhancement allegations), the existence of a criminal street gang as defined in section 186.22, subdivision (f), and to corroborate information contained in the wilas (which in turn was relevant to identifying defendants as the authors thereof). [N.28] (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 820 [evidence regarding defendant's affiliation with gang, gang's prior criminal activities, and notes found in defendant's cell were relevant to gang enhancement allegation].) Although prosecutors may not "have any right to 'over-prove their case or put on all the evidence that they have'" (*People v. Williams, supra,* 170 Cal.App.4th at p. 610), neither will we require them to risk "under-proving" their case. Even assuming some of the prior bad acts may have been cumulative, some were not. "Such relevant and admissible evidence could properly have included even the most inflammatory incidents. [Citation.]" (*Id.* at p. 613.)

> [N.28] " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid.Code, § 210.)

As the evidence was relevant to prove "a fact of consequence," its admission did not violate due process. (*People v. Foster* (2010) 50 Cal.4th 1301, 1335.) Assuming some was testimonial, we likewise have no problem concluding any error was harmless beyond a reasonable doubt. Defendants testified and admitted being Norteños. Gutierrez admitted having been convicted in 1999 of felony assault, while Saldana admitted having been convicted of carjacking in 2006, at which time he was also charged with kidnapping. (See *People v. Allison* (1989) 48 Cal.3d 879, 889–890 [defendant not prejudiced by prosecutor's elicitation of testimony from witness that defendant was in county jail on unrelated charges at particular time, where defense counsel elicited same information in cross-examination of said witness and defendant revealed same information in own testimony].) The record does not support defendants' claim the evidence was offered in an attempt to show criminal disposition or inflame the jury (compare *People v. Memory* (2010) 182 Cal.App.4th 835, 858–859, 862–864), and we find no reasonable likelihood jurors' passions were inflamed (see *People v. Williams, supra,* 170 Cal.App.4th at p. 612). Counsel for Gutierrez elicited, in his cross-examination of Mariscal, that the prior incidents were merely contacts with law enforcement, and that if counsel yelled at a police officer out in the hall or something similar, that could be listed as a contact. Counsel further elicited that Gutierrez was not convicted for the prior acts except for the one in 1999. Counsel for Saldana elicited, in his cross-examination of Mariscal, that part of Mariscal's opinion was based on reports as opposed to his own personal knowledge, and that reliability was always an issue with respect to reports, in that Mariscal had to make a determination whether a report was to be believed.

Significantly, jurors were instructed not to disregard the testimony of any witness (which here included defendants) "without a reason or because of prejudice or desire to favor one side or the other." They were told they had to decide whether information on which an expert relied was "true and accurate." They were also told, however, that in reaching their conclusions as expert witnesses, Mariscal and Teso "considered statements made by the defendants, other gang members, other gang experts, police officers, detectives, probation officers, and parole officers.

You may consider those statements only to evaluate the expert's opinion. *Do not consider those statements as proof that the information contained in the statements is true*." (Italics added.) Finally, jurors were instructed:

> "You may consider evidence of gang activity *only* for the limited purpose of deciding whether defendant acted within [sic] the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancement charge or the defendant had a motive to commit the crime charged.

> "You may also consider this evidence when you evaluate the credibility or believability of a witness. And when you consider the facts and information relied on by an expert in reaching his or her opinion.

> "*You may not consider this evidence for any other purpose*. [¶] ... [¶]

> "*You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.*" (Italics added.)

We presume jurors followed these instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139; *People v. Williams, supra*, 170 Cal.App.4th at p. 613.) Taken together with evidence of guilt that, in our view, was very strong, we conclude any error was harmless under any standard.

Gutierrez, 2013 WL 4523566, at *18–29.

       *b.   Federal Standard*

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const ., Amend. VI.  The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53–54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006).  The Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'"  Crawford, 541 U.S. at 51 (citation omitted); Davis, 547 U.S. at 823–24.  "'Testimony,' in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at 824. As the Davis court explained:

> [a] critical portion of [*Crawford's*] holding ... is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of

the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

Davis, 547 U.S. at 821 (citation omitted).  Thus, nontestimonial statements do not implicate the Confrontation Clause.  Giles v. California, 554 U.S. 353, 376 (2008).  Moreover, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  Crawford, 541 U.S. at 59 n. 9. Additionally, a Confrontation Clause violation is subject to harmless error analysis.  Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).  A Confrontation Clause violation is harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

"Although Crawford did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'"  Delgadillo v. Woodford, 527 F.3d 919, 927 (9th Cir.2008) (quoting Crawford, 541 U.S. at 51).  Subsequent Supreme Court cases have suggested that a statement is "testimonial" if its declarant knew, or should have known, that its primary utility was to provide evidence of the defendant's unlawful conduct for use in his prosecution or a criminal investigation into past events.  See Williams v. Illinois, 567 U.S. 50, __, 132 S.Ct. 2221, 2242 (2012) ("The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions."); Melendez–Diaz v. Massachusetts, 557 U.S. 305 (2009) (opining that a statement is "testimonial" if it was made for an "evidentiary purpose" and "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (internal citation and quotation marks omitted).

1        c. *Analysis*

2        Here, the state court applied the correct legal standard under the Sixth Amendment by

3   applying <u>Crawford</u>, 541 U.S. 36.  Thus, the only question is whether the state court's adjudication

4   is objectively unreasonable.  The Court concludes that it is not.

5        First, the statements relied upon by the gang expert were not testimonial in nature.  The

6   gang expert in this case relied on police reports, offense reports, probation reports, and oral

7   statements from gang members concerning the activities and customs of the local Norteño gangs.

8   The Confrontation Clause applies only to "witnesses against the accused, i.e., those who bear

9   testimony," therefore, it could apply only to the oral statements relied upon by the expert.

10  <u>Crawford</u>, 541 U.S. at 51.  Here, the oral statements could not be considered testimonial in nature,

11  because they bore no resemblance to formalized statements such as affidavits, depositions, prior

12  testimony, or confessions.  <u>Williams</u>, 132 S.Ct. at 2242.  Thus, the statements relied upon by the

13  gang expert did not violate the Confrontation Clause.

14       In addition, even if considered testimonial in nature, the statements were not offered for

15  their truth but only to inform the gang expert's opinion.  For this reason as well, the gang expert's

16  opinion could not violate the Confrontation Clause.

17       Moreover, there is no clearly established Supreme Court precedent finding a violation of

18  the Confrontation Clause resulting from the admission of an expert's opinion based on hearsay

19  statements.  In <u>Williams</u>, a majority of the Supreme Court found that the laboratory results from a

20  nontestifying technician which informed the expert witness were not testimonial in nature and

21  therefore did not violate the Confrontation Clause.  <u>Williams</u>, 132 S.Ct. at 2240, 2242-43.  Also, a

22  plurality concluded that the laboratory results were admitted for the nonhearsay purpose of

23  "illuminating the expert's thought process" rather than establishing the truth of the matter

24  asserted.  <u>Id</u>. at 2240.  Because the Supreme Court has provided no clear answer to this question,

25  "it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law."

26  <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008).

27       Even if there was error, the state court reasonably concluded that the admission of the

28  gang expert's testimony did not have a "substantial and injurious effect or influence on the jury's

verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  As Respondent points out, there was substantial evidence that the shooting was gang-related independent of the expert's testimony. Petitioner and his co-defendant freely admitted to being Norteño gang members at trial.  (RT 1635, 1848, 1863.)  In addition, Petitioner and his co-defendant declared they were Norteños on the "wilas" they wrote while in jail.  (CT 865-67; RT 841-50, 1105-52.)  They affirmed their loyalty to the gang, discussed gang issues, and admitted their prior crimes in the wilas.  (CT[3] 865-67.)  Finally, as noted by the state court, the jury was expressly instructed to consider the evidence of incidents of gang activity to evaluate the expert's opinion testimony, and not for their truth.  (CT 993, 998, 1004.)

Therefore, the petitioner is not entitled to habeas relief because the state court decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent.  And even if error occurred, it could have had no effect on the jury's verdict.  The claim should be denied.

### d.  Due Process Claim

Petitioner also alleges that the admission of the gang expert's testimony violated his due process rights.  A federal court's inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1). With respect to the admission of evidence, there is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process.  In Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009), the Ninth Circuit stated:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." [Citation omitted.] Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

---

[3] "CT" refers to the Clerk's Transcript on Appeal.

1     Since there is no clearly established Supreme Court precedent governing a trial court's

2   discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.

3   Holley, 568 F.3d at 1101.  Therefore, Petitioner cannot demonstrate that the state court decision

4   was contrary to, or involved an unreasonable application of, clearly established federal law.  See

5   28 U.S.C. § 2254(d).  The due process claim should also be denied.

6                    *8.  Claim Nine – Redaction of Statements*

7     Petitioner contends that the trial court erred by failing to redact highly prejudicial

8   statements from the "wilas" written in the Stanislaus County Jail.  He claims the admission of this

9   evidence violated his due process rights.

10                    *a.  State Court Decision*

11   This claim was raised and rejected by the Fifth DCA as follows:

12   Defendants claim the trial court erred when it failed to redact those portions of the
     wilas attributed to them that were more prejudicial than probative. They say
13   admission of the evidence violated their federal and state due process rights to a
     fair trial. We conclude any error was harmless.
14

15   *1.  Background*

16   The prosecutor moved, in limine, for admission of the wilas that are described in
     the statement of facts, *ante*. He asserted they were highly probative on the issues
     of premeditation, motive for Villanueva's removal from Norteño ranks, and
17   defendants' knowledge of the criminal gang activity of the Norteño gang as
     required for proof of the gang enhancement allegation. Copies of the wilas were
18   attached to the motion. [N.29]

19         [N.29] The prosecutor's in limine motion also addressed authentication.
           The trial court held an Evidence Code section 403 hearing on the issue. It
20         determined there was sufficient proof of authenticity to allow the wilas to
           go before the jury, but permitted defendants to challenge authentication in
21         front of the jury.

22   Gutierrez asserted that portions of the wilas were irrelevant, highly prejudicial, and
     inflammatory, and should be excluded under Evidence Code section 352. An
23   attempt by counsel to reach an agreement on redactions was unsuccessful, and so
     the matter was left for the court's determination.
24

25   Saldana objected only to certain portions of his wila. He first objected to No. 6, in
     which Saldana related he had two strikes, one for carjacking and one for assault
26   with a firearm. [N.30]  The prosecutor conceded Saldana only had one strike—for
     carjacking—and that the strike allegation had been bifurcated. He argued,
     however, that the same information was going to come in through the gang
27   expert's testimony concerning the primary activities of the gang, and also that,
     considered in conjunction with the answer in No. 15 about "Chubbs" (Anthony
28   Fuentes), it was probative on the now-jury-issue of authentication. Gutierrez

joined, noting No. 6 of his wila related that he had one strike. He argued the connotation of having a strike was particularly prejudicial, beyond even the criminal record itself. The trial court directed the prosecutor to redact references to strikes, but to leave the charges. As for the reference in Saldana's wila to assault with a firearm, the court declined to redact it, saying, "[I]f that is what he or somebody else puts, that's what stays in there," and if it was incorrect, the defense could address the discrepancy at trial.

> [N.30] The information contained in the wilas corresponded to the Norteño new arrival questionnaire and apparently was numbered accordingly. The questionnaire itself is not contained in the record.

Saldana next objected to No. 10, which set out the times and places he was incarcerated beginning in 2004, the charges he faced, the fact he was on parole at one point, and three people who were in custody with him at each location. He argued this portion of the wila was confusing and had no real probative value. The prosecutor responded that there would be expert testimony the people listed were Norteños. He sought admission of No. 10 in its entirety, to show an ongoing association of three or more members and to counter any suggestion Varrio West Side Turlock was merely a neighborhood or club. The prosecutor argued that the listing in the wila of individuals from other cliques was consistent with the gang expert's anticipated testimony, and went directly to one of the required elements of section 186.22. The prosecutor agreed the information was being offered for a limited purpose, and noted the jury instructions would directly address the limited use to which the gang expert's testimony could be put. The trial court ruled No. 10 would be allowed, subject to a limiting instruction.

Counsel for Saldana stated: "Then I would object to a copy of [exhibit] 56 being presented to the jury if—it sounds like it is all going to get in, then let's let it all in and give them the original and let them decide whether that was actually written by Mr. Saldana." He emphasized that he wanted the jury to have the original, not an enlarged copy. Asked by the court if he was withdrawing any objections, counsel stated: "Yes. But I want them to see the original." After a brief discussion about whether the enlargement could also be admitted, the court clarified, "[Saldana] is withdrawing any objection, so long as the original is introduced into evidence." Counsel for Saldana responded, "Yes."

The hearing then turned to Gutierrez's objections. He first objected to No. 6, which related that he had one strike for assault with a firearm in 1999. Gutierrez argued the whole area ought to be redacted, because typically a jury would not be told about someone's criminal background. The court ruled the word "strike" would be redacted, but the remainder would be admitted for a limited purpose.

Gutierrez next objected to No. 10, which related the same sort of information as was contained in No. 10 of Saldana's wila, and stated that at one point, Gutierrez was returned to county jail for "666/187" but charges were never filed. Counsel for Gutierrez argued that allowing the jury to hear about assaults with a firearm and attempted murder, for which charges were never filed, was "incredibly prejudicial" and would cause jurors to be biased against him because they would think somehow he got away with something. Counsel also argued this was in essence a coerced statement rather than an admission, since people were required to answer these questions in order to survive in jail. The prosecutor responded that, as was the case with Saldana, No. 10 showed association with gang members from other groups and the requisite ongoing association of three or more people. The prosecutor also argued it would counter the anticipated defense argument, that

"this is nothing but a bunch of boys who were foolish or knuckleheads...." The court found no evidence of coercion, and ruled No. 10 was admissible, subject to a limiting instruction.

Gutierrez next objected to No. 24, which read, "Yes, I will assist La Casa in a removal at any time." Defense counsel expressed concern the jury could take that to mean Gutierrez was prepared to kill someone. He also related that he "probably" did not intend to contest that Gutierrez was the source of at least some of the information in the wila, and so, since he was "not going to be aggressively or non-aggressively disputing a lot of things in front of this jury," did not believe the prosecutor had "all these big hurdles...." The trial court ruled No. 24 would be received, subject to a limiting instruction.

Gutierrez next objected to No. 25, which listed other charges pending against him. Defense counsel argued the fact someone might have charges pending was not relevant and was prejudicial overkill, and he expressed concern the jury would conclude Gutierrez was someone who did not observe the law. The prosecutor argued the information, when considered in conjunction with the chronology and charges listed in No. 10, was probative of authentication, and the fact Gutierrez said he was arrested for manufacturing went to the primary activities of the gang. The information coming from Gutierrez himself would add to the credibility of the gang expert's opinion testimony concerning the primary activities of the gang. The trial court ruled the evidence would be allowed, subject to a limiting instruction.

Gutierrez had no further objections. The trial court again confirmed that counsel for Saldana wanted the entire wila admitted as to his client.

The wilas were admitted into evidence during Mariscal's testimony. With respect to Gutierrez's wila, Mariscal testified in part that his investigation revealed other evidence showing Gutierrez had a conviction for assault with a firearm in 1999; one of the charges listed—possessing pills for sale—was consistent with one of the primary activities of the Norteño gang; and Gutierrez's pending charges included a moving violation, which involved Gutierrez being stopped approximately two weeks before the shooting in the white Altima that was burned in San Jose after the shooting.

Mariscal read No. 10 to the jury. He explained that the references to "3Ns" were consistent with someone reporting other active Norteños with whom he was housed, and that this played into the requirement of an ongoing association of three or more people. This was an example of a gang member associating with other Norteños. Mariscal testified No. 16 read, "I have no problems functioning with la casa's expectations," which told Mariscal that Gutierrez was fully willing to be an active participant in the Norteño organization in custody, and to follow their rules, policies, and expected behavior. With respect to No. 24, in which Gutierrez wrote he would assist La Casa in a removal at any time, Mariscal testified this indicated Gutierrez was willing to participate in a removal or assault upon someone if the gang determined a fellow gang member was to be removed or assaulted for any reason. Mariscal also read No. 15 to the jury, in which Gutierrez explained how Villanueva was threatening the lives of Gutierrez and his children, and about the altercation in which Saldana was assaulted.

Mariscal's testimony concerning Saldana's wila was similar with respect to the meaning and significance of various portions, and how the wila played into his opinions in this case. [N.31]  Mariscal read No. 15 to the jury; in it, Saldana stated that, although he was not aware if Villanueva was active or nonactive, on several

occasions he promoted himself as a degenerate. Mariscal explained that a degenerate was the worse possible thing a gang member could be in the eyes of the gang. Saldana also wrote about how Villanueva and his companions threatened Saldana and his family, and about the altercation at the wedding reception. Saldana said they arrived in a car driven by Fuentes, also known as Chubbs, who "snitched" on Saldana for carjacking in 2004. Saldana wrote that people were saying "they" killed Villanueva because they had the most problems with him, and now people were threatening to kill their children and their mother.

> [N.31] At one point, counsel for Saldana objected that Mariscal was not reading the entire wila.

Gutierrez testified that he suffered a felony assault conviction in 1999. He admitted Northerners dealt drugs as one of their primary activities, and that, after the March 22 fight, he hung around with other gang members, dealing drugs. He testified Mariscal was correct when he said Norteños dealt drugs as one of their primary activities. He testified that although he did not know Bond No. 13, he answered yes to the question about it just to let "them" know he would assist in "whatever it was." He also testified that when he wrote he had no problem functioning with La Casa's expectations, he meant whatever was expected or asked by the Norteño gang. With respect to his answer about assisting in removal, he explained that to him, removal meant assaulting someone, possibly a fellow gang member. So far as he knew, there was no way a Norteño got removed other than being assaulted.

Saldana testified that he was convicted of carjacking in 2006. He was also facing a kidnapping charge with a potential life sentence, and so he accepted a deal in which the kidnapping charge was dropped and he received three years. Asked why, if he did not shoot Villanueva, he fled with his brother, Saldana brought up his parole status. Asked what he meant when he wrote, "It would be an honor to assist la casa in a removal," he responded he did not know. Asked if he would do anything the gang told him to do, he replied, "Yeah, pretty much."

The limiting instructions given to the jury with respect to the gang evidence are described ante. In addition, jurors were told they had heard evidence defendants made an oral or written statement before trial; jurors were to decide whether a defendant made any such statement in whole or in part; if they decided a defendant made such a statement, it was to be considered along with all the other evidence, and jurors were to decide how much importance to give it; and they could not convict a defendant of any crime based on his out-of-court statements alone.

2. *Analysis* [N.32]

> [N.32] The Attorney General says Saldana forfeited his claim of error when his trial counsel expressly withdrew his objections and request for redaction and asked that the wila attributed to Saldana be presented to the jury in its entirety. Generally speaking, a defendant who withdraws his or her objection to evidence cannot complain, on appeal, of its admission. (*People v. Jones* (2003) 29 Cal.4th 1229, 1255; *People v. Robertson* (1989) 48 Cal.3d 18, 44.) Under the circumstances here, however, "[w]e will assume ... that [Saldana's] decision to do so was an instance of a party making the best of an allegedly erroneous ruling, and therefore does not bar his claim on appeal. [Citation.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 289.)

The Attorney General also contends Gutierrez's claim has been forfeited, because Gutierrez has simply joined in Saldana's contention on appeal without supplying argument on the issue as it applies to Gutierrez himself. The Attorney General says Gutierrez's claim involves different evidence and a different defendant than Saldana's claim; hence, the prejudice analysis must be different. In light of the similarity between the wilas and the overall trial evidence as it pertains to both defendants—as demonstrated by the Attorney General's own argument on the merits of admission of the wilas—we decline to find forfeiture on Gutierrez's part.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Under this statute,

"[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. [Citations.] ""'Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of undue prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.... [E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' [Citation.]" (*People v. Scott* (2011) 52 Cal.4th 452, 490–491; see *People v. Holford* (2012) 203 Cal.App.4th 155, 167.)

"[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.) The trial court need not expressly weigh prejudice against probative value, or state it has done so. (*People v. Waidla, supra*, 22 Cal.4th at p. 724, fn. 6.)

We find no abuse of discretion in the present case. Some of the information recited in the wilas about defendants' criminal activity came before the jury through their own testimony, and so was probative on the question of the wilas' authenticity, a disputed question upon which the jury had to make the final determination. It can hardly have come as a surprise to jurors that defendants had been in custody and

faced charges beyond those for which they were on trial; in addition to admitting he had a prior felony conviction for assault, Gutierrez testified he had been in a lot of fights, mostly because of the people with whom he associated, said he planned to sell marijuana on the day of the shooting, and admitted intentionally burning a vehicle; while Saldana admitted his prior conviction for carjacking also originally involved a kidnapping charge, and that he was on parole at the time of the shooting.

Many of the past or pending charges recited in the wilas were probative of Mariscal's opinions concerning the Norteños' primary activities and pattern of criminal gang activity, and the prosecutor questioned Mariscal about them in that context. Defendants point to the fact there was testimony Stanislaus County contained 3,000 to 4,000 documented Norteños, but the prosecutor was still required to prove every element of the section 186.22, subdivision (b) enhancement, including the existence of a criminal street gang as defined in subdivision (f) of section 186.22. Thus, he had to prove not only an ongoing association of three or more persons, but also the primary activity or activities of that group, and that the group's members engaged in a pattern of criminal gang activity as defined in subdivision (e) of the statute. (See *People v. Coddington* (2000) 23 Cal.4th 529, 597, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) The prosecutor was not obliged to prove those elements through other evidence simply because he might have had the means to do so. (See *People v. Watson* (2008) 43 Cal.4th 652, 684.) The information in the wilas concerning other Norteños with whom defendants had been incarcerated was also probative; it demonstrated that the various cliques—including Varrio West Side Turlock—were not simply neighborhood groups, but were under the larger Norteño criminal street gang umbrella. (See *People v. Williams* (2008) 167 Cal.App.4th 983, 987–988.)

Under the circumstances, most, if not all, of the challenged evidence was highly probative of issues actually in dispute, and was not substantially outweighed by the risk of undue prejudice, especially in light of the limiting instructions given by the trial court. (See *People v. Fuiava, supra*, 53 Cal.4th at pp. 669–670; *People v. Richardson* (2008) 43 Cal.4th 959, 1004.) Accordingly, defendants have failed to establish the trial court abused its discretion in admitting the bulk of the wilas' contents. (See People v. Branch (2001) 91 Cal.App.4th 274, 286–287.)

To the extent there was error (for example, in the admission of Saldana's inaccurate representation that he had a prior conviction for assault with a firearm; Gutierrez's apparent arrest, without charges ever being filed, for attempted murder; and both defendants' professed willingness to assist in a removal), we have examined the record and conclude there is no reasonable probability the jury would have reached a different result had the evidence been excluded. (*People v. Whitson* (1998) 17 Cal.4th 229, 251; *Watson, supra*, 46 Cal.2d at p. 836.) Defendants claim the error rendered their trial fundamentally unfair, so that we must assess prejudice under the more rigorous *Chapman* standard. (See *People v. Williams, supra*, 170 Cal.App.4th at p. 612.) In light of the properly admitted evidence and the trial court's limiting instructions, however, we conclude defendants have failed to satisfy the required "high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial." (*People v. Albarran, supra*, 149 Cal.App.4th at p. 229; see *People v. Richardson, supra*, 43 Cal.4th at p. 1004; *People v. Champion* (1995) 9 Cal.4th 879, 925, overruled on another ground in *People v. Combs* (2004) 34 Cal.4th 821, 860.) This case simply does not present "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial

1    fundamentally unfair." (*People v. Albarran, supra*, 149 Cal.App.4th at p. 232.)

2    Gutierrez, 2013 WL 4523566, at *29–34.

3                    *b.  Federal Standard*

4            As previously stated, a federal court in a habeas proceeding does not review questions of

5    state evidence law.  The Court's inquiry is limited to whether the evidence ruling "resulted in a

6    decision that was contrary to, or involved an unreasonable application of, clearly established

7    Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

8    As to the admission of overtly prejudicial evidence, there is no Supreme Court precedent

9    governing a court's discretionary decision to admit evidence as a violation of due process.  See

10   supra, Holley, 568 F.3d at 1101.  Since there is no clearly established Supreme Court precedent

11   governing a trial court's discretionary decision to admit evidence as a violation of due process,

12   habeas relief is foreclosed.  Id.  Therefore, Petitioner cannot demonstrate that the state court

13   decision was contrary to, or involved an unreasonable application of, clearly established federal

14   law, and the claim should be denied.

15           Even if habeas review were available, it is clear that the admission of the contested

16   evidence did not prevent a fair trial.  As noted by Respondent, Petitioner did not allege that the

17   entire wila was inadmissible.  Rather, he claimed that three responses should have been redacted.

18   But it is clear that those three statements were highly relevant to prove the allegation that the

19   murder had been committed for the benefit of, at the direction of, or in association with, a

20   criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by

21   gang members.  See Cal. Penal Code § 186.22.

22           First, Petitioner's pending charges were relevant to inform the gang expert's opinion that

23   the Norteño gang engaged in a pattern of criminal gang activity, and Petitioner was an active gang

24   member.  Second, his identification of other Norteño gang members he was housed with during

25   his incarcerations was relevant to inform the gang expert's opinion that there was an ongoing

26   association of three or more people and that Petitioner associated with the Norteños.  Finally,

27   Petitioner's statement that "Yes, I will assist La Casa in a removal at any time" was relevant to

28   inform the gang expert's opinion that Petitioner was an active Norteño gang member who was

                                             74

1  committed to the gang's activities.  (CT 865.)  Because the prosecution bore the burden of

2  proving all elements of the offense, this evidence was admissible and highly relevant to the

3  prosecution's case.

4      In any case, Petitioner has failed to demonstrate that the state court finding that any error

5  was harmless was unreasonable.  He fails to show that the state court's decision was "so lacking

6  in justification that there was an error . . . beyond any possibility for fairminded disagreement."

7  Harrington, 562 U.S. at 103.  Petitioner freely admitted to being a member of the Norteño gang,

8  he admitted he aided his co-defendant in writing the wila, and he agreed with what was written in

9  the wila.  (RT 1635, 1703, 1712, 1781, 1785-86, 1848, 1855.)  He testified about his prior

10  conviction for assault and he admitted he had been in jail before.  (RT 1702.)  Finally, he agreed

11  that he would do anything the gang told him to do.  (RT 1777-78.)  Therefore, any prejudice

12  resulting from inferences drawn from the statements in the wila would have resulted from his own

13  testimony as well.  In addition, the jury was given cautionary instructions concerning his out-of-

14  court statements.  (CT 1002; RT 1003.)

15      Accordingly, Petitioner's claim that the admission of evidence violated his due process

16  rights should be denied.

17              *9.  Claim Ten – Prosecutorial Misconduct*

18      Petitioner alleges the prosecutor committed misconduct by telling the jury in closing

19  argument to "send a message to the Norteño street gang."  See Pet. at 24.  This claim was

20  addressed in Claim Two, *supra*.

21              *10. Claim Eleven – Gang Allegation*

22      In his next claim, Petitioner alleges that the evidence was insufficient to support the

23  finding that the offense of murder was committed for the benefit of, at the direction of, or in

24  association with, a criminal street gang with the specific intent to promote, further, and assist in

25  criminal conduct by gang members.  See Cal. Penal Code § 186.22(b)(1).

26              *a.  State Court Decision*

27      This claim was also raised on direct review to the Fifth DCA where it was rejected as

28  follows:

Defendants contend the evidence is insufficient to sustain the jury's true finding on the section 186.22, subdivision (b) enhancement. We disagree.

To establish the gang enhancement under section 186.22, subdivision (b), "the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, [and that it was committed] with the specific intent to promote, further, or assist in any criminal conduct by gang members.' [Citations.]" (*Gardeley, supra*, 14 Cal.4th at pp. 616–617.) [N.33] Defendants say the evidence fails to prove the shooting was to benefit the gang or that it was done with the requisite specific intent.

> [N.33] The prosecution must also prove "that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting, two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. [Citations.]" (*Gardeley, supra*, 14 Cal.4th at p. 617, italics omitted.) Defendants do not claim these elements were insufficiently established.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson, supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367.) "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable to both convictions and gang enhancements (*People v. Leon* (2008) 161 Cal.App.4th 149, 161), and regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125).

"[T]he Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment ... only if the crime is "gang related."' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "The crucial element ... requires that the crime be committed (1) for the benefit of, (2) at the direction of, or (3) in association with a gang." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) [N.34]

> [N.34] The verdicts in this case accurately stated the requirement in the disjunctive. Neither the jury nor we need find evidence showing the crime was committed for the benefit of or at the direction of the Norteño gang, if

76

there is substantial evidence the crime was committed in association with a gang.

In this case, the People presented evidence defendants, who were fellow gang members, committed the crime in association with each other. (See *People v. Leon, supra*, 161 Cal.App.4th at p. 163.) "Not every crime committed by gang members is related to a gang." (*Albillar, supra*, 51 Cal.4th at p. 60.) "Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang." (*People v. Morales, supra*, 112 Cal.App.4th at p. 1198.) From the information contained in the wilas, together with the testimony of the gang experts, however, the jury here reasonably could have concluded the shooting was gang related, and that defendants "relied on their common gang membership and the apparatus of the gang"—particularly the assumption none of the witnesses would interfere with defendants' actions or later talk to police—in committing the crime. (*Albillar, supra*, 51 Cal.4th at pp. 60, 61–62.) That defendants are brothers "does not cancel out that [joint gang] membership." (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332.)

We recognize that it has been said an expert's testimony alone is not sufficient to find that an offense is gang related. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931.) Nevertheless, such testimony constitutes circumstantial evidence jurors may take into consideration in determining whether the prosecution has proven the elements of the criminal street gang enhancement. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048; *Ferraez, supra*, at p. 930.) Here, beyond the expert testimony, the record provided "'some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations....'" (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.) [N.35]

> [N.35] The record also contains support for the notion the homicide benefited the Norteño criminal street gang. The fact there was also evidence the Norteño gang disapproved of "red-on-red" violence, and that Miguel Perez, a gang dropout, nevertheless socialized with a number of individuals with ties to the gang, was something for jurors to assess and does not render the evidence supporting the enhancement insufficient.

The record also contains substantial evidence of the requisite intent, namely, "the specific intent to promote, further, or assist criminal conduct by gang members." (*Albillar, supra*, 51 Cal.4th at p. 67.) "'"[T]he scienter requirement in section 186.22[, subdivision] (b)(1) ... applies to any criminal conduct, without a further requirement that the conduct be "apart from" the criminal conduct underlying the offense of conviction sought to be enhanced.' [Citation.] '[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1171.) A specific intent to benefit the gang is not required. (*People v. Leon, supra*, 161 Cal.App.4th at p. 163; *People v. Morales, supra*, 112 Cal.App.4th at p. 1198.)

In the present case, jurors reasonably could have inferred, particularly from the information in the wilas and the gang experts' testimony, that, in fighting with and then shooting Villanueva, defendants had the specific intent to promote, further, or assist criminal conduct by each other as gang members. [N.36] Section 186.22, subdivision (b)(1) "applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*Albillar, supra*, 51 Cal.4th at p. 68.) Here, there was ample evidence defendants intended to

attack Villanueva, assisted each other in bringing about his demise, and were each members of the Norteño criminal street gang. "Accordingly, there was substantial evidence that defendants acted with the specific intent to promote, further, or assist gang members in that criminal conduct." (*Ibid*.; see *Emery v. Clark* (9th Cir. 2011) 643 F.3d 1210, 1216.)

> [N.36] The nature of the evidence in this case distinguishes it from cases such as *People v. Ramon* (2009) 175 Cal.App.4th 843, 846–851; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1195–1199; and *People v. Killebrew* (2002) 103 Cal.App.4th 644, 647–659, disapproved on another ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1047–1048 and footnote 3.

We recognize there was evidence from which jurors could have concluded Villanueva was shot by accident or in self-defense, or even intentionally but for reasons that were personal to defendants and unrelated to a gang. This does not mean, however, the gang enhancement was unsupported by substantial evidence. It was up to jurors to determine what evidence to believe. Reversal on the ground of insufficiency of the evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's finding. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Reversal is not warranted here.

Gutierrez, 2013 WL 4523566, at *34–36.

### b.   Federal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

> [W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Id., at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.  Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

1    conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

2           After the enactment of the AEDPA, a federal habeas court must apply the standards of

3    Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

4    2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

5    correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

6    477 U.S. 436, 459 (1986).

7           In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further

8    explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

9           makes clear that it is the responsibility of the jury - not the court - to decide what
10          conclusions should be drawn from evidence admitted at trial. A reviewing court
             may set aside the jury's verdict on the ground of insufficient evidence only if no
             rational trier of fact could have agreed with the jury. What is more, a federal court
11          may not overturn a state court decision rejecting a sufficiency of the evidence
             challenge simply because the federal court disagrees with the state court. The
12          federal court instead may do so only if the state court decision was "objectively
             unreasonable."
13
            Because rational people can sometimes disagree, the inevitable consequence of
14          this settled law is that judges will sometimes encounter convictions that they
             believe to be mistaken, but that they must nonetheless uphold.
15

16   Id. at 2.

17          c.   Analysis

18          Here, the state court correctly applied the Jackson standard.  Therefore, the only question

19   is whether that application was unreasonable.  After reviewing the record, the Court cannot

20   conclude that the state court determination was unreasonable.

21          There are two essential elements to the statute: 1) that the defendant committed or

22   attempted to commit the crime for the benefit of, at the direction of, or in association with a

23   criminal street gang; and 2) that the defendant intended to assist, further, or promote criminal

24   conduct by gang members.  People v. Gardeley, 14 Cal.4th at 615-16.

25          First, there was ample evidence from which a jury could find that the murder was

26   committed "in association" with the Norteño gang.  There was overwhelming evidence that

27   Petitioner and his co-defendant were Norteños.  There was also evidence in the wilas written by

28   Petitioner that he and his co-defendant acted against the victim because the victim "promoted

himself as a degenerate" and associated with inactive Norteños.  (CT 866.)  There was evidence that the motivation was to further the interests of the gang.  In addition, the murder took place at a gathering of Norteños in full view of the gang.  Petitioner relied on the apparatus of the gang to conduct the murder.  Based on the foregoing, there was sufficient evidence from which a jury could conclude the murder was done in association with the Norteño gang.  According to the gang expert, such an act would garner respect and status for Petitioner within the gang, and show others that disrespect to the gang would not be tolerated.

Second, there was sufficient evidence from which the jury could find that Petitioner intended to assist and promote criminal conduct by gang members.  In the wila, Petitioner portrayed himself as an active Norteño gang member.  He further explained his actions to the gang leadership as to why he attacked another gang member and why he was justified according to the gang's rules.  The murder took place at a Norteño gathering in full view of the gang, and in association with a fellow gang member.  From the evidence, the jury could infer that Petitioner had the specific intent to promote, further or assist criminal conduct by each other as gang members.

Petitioner fails to show that the state court decision was an unreasonable application of the Jackson standard.  The claim should be denied.

### 11.    Claim Twelve – Restitution Fine

Petitioner next claims the court imposed the maximum restitution fine without conducting a hearing on his ability to pay.

During sentencing, the court stated, "Before I get there, do either defense counsel have any comments about the restitution request?"  (RT 2144.)  Petitioner co-defendant's counsel responded, "My client is not prepared to agree with that, Your Honor." (RT 2144.)  Petitioner's counsel joined, stating, "Nor is mine. . . my client has no ability to pay whatsoever, your Honor."  (RT 2144.)  The court then ordered restitution for the victim's mother in the amount of $7,500, and a restitution fine in the amount of $10,000.  (RT 2144-45.)

Respondent is correct that Petitioner may not challenge the restitution fine on federal habeas review.  Section § 2254(a) authorizes a federal court to review a petition for writ of habeas

corpus only on the ground that he is "in custody in violation of the Constitution or laws or treaties of the United States."  The imposition of a fine is insufficient to satisfy § 2254's jurisdictional requirements.  <u>Bailey v. Hill</u>, 599 F.3d 976, 978 (9th Cir. 2010).  Petitioner is not in custody pursuant to the restitution fine, and a challenge to the restitution fine has no effect on Petitioner's custody.

In addition, Petitioner fails to demonstrate any prejudice resulting from counsel's failure to request a hearing.  Petitioner does not point to any evidence that would have demonstrated an inability to pay, such that the outcome would have been different.  Petitioner was sentenced to a lengthy term and he would be able to work in prison, which would provide ample opportunity to pay the fines.  Therefore, the claim should be rejected.

## IV.     RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  __**March 2, 2017**__                    _____**/s/ Jennifer L. Thurston**
                                                            UNITED STATES MAGISTRATE JUDGE